QUILLIAN *v.* JOHNSON, executor, and *vice versa.*

1. Though a suit may have been brought by one of two executors against his coexecutor and another alleged to be jointly interested with him in defeating a valid demand of the estate represented by the plaintiff, yet if it appears from the facts brought out at the trial that the executor named as a defendant really has no personal interest in the outcome of the litigation, he may, upon the death of the plaintiff after the case has come to this court for review, be substituted in his stead as the party entitled to represent the interests of his testator's estate.

2. Where such a suit is brought, the executor alleged to have personal interests inimical to those of the estate should be named as a party defendant in his individual capacity, as he can not properly be joined as a party plaintiff in his representative capacity.

3. Notwithstanding a defendant may file a plea in abatement at the first term, he can not, by way of amendment to the plea at the trial term, set up new and distinct grounds why the action should abate, unless the plaintiff has so amended his pleadings as for the first time to make available the matters of defense sought to be urged by an amendment to the defendant's plea.

4. A mistake made in alleging the date on which an instrument was executed may, ordinarily, be cured by appropriate amendment.

4

5. Irrespective of whether the holder of a policy of insurance on his own life may legally sell and assign the policy to one having no insurable interest in his life, the policy-holder is certainly not at liberty to make the policy the subject-matter of a purely wagering and speculative contract between himself and a person having no interest therein.

6. By express statute, in this State, money paid or property delivered up in pursuance of a gaming contract may be recovered from the winner by the loser, if suit therefor be instituted within six months after the loss.

7. The verdict which the court directed the jury to return was demanded under the law and the undisputed evidence, regardless of testimony admitted over the objection of the complaining party ; and the testimony which he offered, but which was rejected by the court, was not such as would have authorized any other result.

Argued October 27, 1904. —Decided February 1, 1905.

Equitable petition. Before Judge Henry. Clarke superior court. April 15, 1904.

*F. A. Quillian* and *Lumpkin & Burnett,* for Quillian.
*S. H. Sibley, J: C. Hart,* and *G. C. Thomas,* contra. '

Evans, J. On April 15, 1902, the Mutual Benefit Life Insurance Company issued to Grigsby E. Thomas Jr. a policy on his life for $10,000, payable at his death to his executors, administrators, or assigns. On February 11, 1903, Thomas executed a written assignment of the policy, reciting that for value received he assigned all his interest therein to D. D. Quillian, subject to any indebtedness thereon to the company; and on April 27, the secretary of the company indorsed upon this instrument the company's recognition of this assignment of the policy. Thomas died on the date last mentioned, and Quillian subsequently prepared and submitted to the insurance company proofs of death. Neither the policy nor the written assignment thereof was delivered by Thomas to Quillian, but both were placed in the hands of L. M. Johnson, a local agent of the company, in pursuance of the terms of a cotemporaneous writing, executed by Quillian, of which the following is a copy : "Athens, Ga., February 11th, 1903. Know all men by these presents, that whereas Grigsby E. Thomas Jr. has a policy of insurance on his life, No. 326,547 in the Mutual Benefit Life Insurance Company of Newark, New Jersey, and a quarterly premium thereon, amounting to $151.52, due January 15th, with 30 days grace allowed by the Company, and whereas the said Thomas has requested Dr. D. D. Quillian to pay said premium for him, in case he does not do so by February 15, 1903,

and for valuable considerations has assigned said policy to said Quillian: Now this agreement witnesseth that I, the said Quillian, in the considerations aforesaid, agree to pay said premium on said policy on or before February 15th, 1903, and agree that L. M. Johnson shall hold said assignment for 90 days, and that said Thomas has the privilege of repaying said premium within said specified time; then the assignment is to be returned to him. In the event he fails to pay the said premium within the 90 days, then the policy and the assignment is left to said Quillian, to do as he deems best with it. Should the said Thomas die within the ninety days specified, the said Quillian agrees to pay the minor children of the said Thomas, to wit Grigsby E. Thomas IV, and Marie Virginia Thomas, the sum of $1,000.00 each out of the proceeds of said policy, and further agrees to pay L. M. Johnson the amount due him by said Thomas. Promissory notes given therefor by said Thomas. [Signed] D. D. Quillian. Witness: L. M. Johnson." There was, in point of fact, no consideration for the assignment of the policy other than the promise of Quillian to pay the past-due quarterly premium, which he afterwards fulfilled, and his agreement to pay out of the proceeds of the policy, in the event of the death of Thomas within the ninety-day period, $1,000 each to the children named, and his oustanding indebtedness to Johnson, evidenced by promissory notes, amounting to something like $1,300. After Thomas died, Quillian did, on May 7th, 1903, pay to Johnson the amount due on these notes. During the last illness of Thomas, a futile attempt was made by some of his friends to see Quillian and redeem the policy; and after his death, but still within the ninety-day period named in the above-quoted writing, an effort was made by I. H. Toll, as executor of Thomas, to procure a surrender of the policy by paying Quillian the amount of the quarterly premium he had advanced and such other demands as he might have against the estate of Thomas. Quillian declined to treat with Toll, saying he had purchased the policy from Thomas, and, under the terms of sale agreed on between them, the policy belonged to him (Quillian), and the estate of Thomas had no interest therein.

 On May 8, 1903, the widow of Thomas, in behalf of herself and as next friend for two minor children, joined with Toll, his executor, in a petition to the superior court of Clarke county, the,

purpose of which was to prevent Quillian from collecting the pro-
ceeds of the policy from the insurance company, and to invoke a
decision of the court as to what interest (if any) Quillian had in
the policy or its proceeds.   The company and two of its agents,
Angier and Johnson, were made coparties defendant with Quil-
lian, the plaintiffs alleging that the company was about to pay the
proceeds of the policy to Quillian through these agents, and pray-
ing that it and its agents be enjoined from carrying this pur-
pose into effect.   The insurance company, after the court had
granted the restraining order prayed for, filed an answer in which
it offered to pay the amount due on the policy into the registry
of the court, to be paid out under its direction to the party
entitled thereto, and in which it asked to be discharged upon
so doing.   By consent of the parties at interest, the insurance
company paid this amount over to a banking institution, to be
held by it to await the final decree of the court, and an order
was taken dismissing the company and its agents as parties de-
fendant.   Later, L. M. Johnson was made a party defendant
in his individual capacity, and the names of Mrs. Thomas and
her children were stricken from the petition, so that the action
proceeded in the name of Toll, executor, as sole plaintiff, against
Quillian and Johnson.   Quillian alone filed pleadings in resist-
ance of the action.   A trial was had on the merits; and after
the conclusion of the evidence, the court directed a verdict as
to what disposition should be made of the fund in controversy,
as between the plaintiff and Quillian, and a judgment in ac-
cordance with this verdict was duly entered.   Quillian there-
upon sued out a bill of exceptions to this court, wherein he
complains of the direction of this verdict, and assigns error upon
various rulings made by the court during the progress of the
trial.   The plaintiff below then sued out a cross-bill of excep-
tions, making complaint of a ruling adverse to him.   On the
call of the case in this court, his death was suggested of record,
and counsel for Quillian asked that an order be passed making
the coexecutor of Toll a party in his stead, his coexecutor be-
ing L. M. Johnson, who was named as such in the will of Thomas
and who had duly qualified.   Counsel representing Mrs. Thomas
and her minor children appeared and objected to this substitu-
tion, on the ground that Johnson was an adverse party in the

court below and his interests were inimical to those of the estate of Thomas; and, for this reason, counsel asked that Mrs. Thomas, in her own behalf and as next friend of her minor children, be made a party in lieu of Toll, the deceased executor. Upon the question thus presented this court reserved its decision, and counsel for the parties at interest were permitted to argue the case on its merits.

1. The logical party to represent the estate of Thomas in this court is his surviving executor, L. M. Johnson, provided he is in a position where he can, in justice to himself and to that estate, undertake to do so. Upon examination of the brief of the evidence, we find that before this suit was instituted Quillian had paid to Johnson the entire amount due on the promissory notes he held against Thomas, and that Johnson is not liable thereon as an indorser, having merely marked the notes "paid" and surrendered the same to Quillian. Indeed, Quillian testified that there had been a final settlement between himself and Johnson touching the latter's interest in the proceeds of the policy, and that he no longer had any interest whatever in the policy or in the result of this litigation. Johnson did not defend the action, nor, so far as appears, take any active part in the proceedings, other than to appear as a witness. He suffers no personal liability under the judgment rendered, gets no benefit therefrom, nor would he be benefited were it to be set aside. The interest of the estate is that this judgment be affirmed; and, in the event of its affirmance, the litigation will be at an end, and Johnson, in his capacity as surviving executor, will be entitled to receive the fund which, under that judgment, was awarded to Toll, his deceased coexecutor, who was the plaintiff below. Such being the truth of the matter, as disclosed by the record before us, we see no reason why Johnson is disqualified from performing his full duty as executor, relatively to this litigation, and we have accordingly passed an order making him, in that capacity, a party defendant to the main bill of exceptions and a party plaintiff to the cross-bill, in lieu of Toll, who occupied a similar relation to the case at the time it reached this court.

2. At the appearance term of the case Quillian filed a plea in abatement, therein alleging that L. M. Johnson was a co-

executor of the plaintiff Toll, and, as such, a necessary party plaintiff to the case. This plea was stricken on demurrer, after an amendment had been allowed to the plaintiff's petition, in which amendment the plaintiff charged that Johnson was jointly interested with Quillian and was acting in concert with him in claiming the proceeds of the policy under the assignment thereof made by Thomas to Quillian. In view of this contention, the trial judge rightly ruled that, because of personal interest, Johnson was not a proper plaintiff, as a coexecutor, but was properly made a codefendant in his individual capacity. See *McLendon* v. *Woodward*, 25 *Ga.* 252; *Sheehan* v. *Kennelly*, 32 *Ga.* 145; *Lamar* v. *Lamar*, 118 *Ga.* 691.

3. At the trial term Quillian offered an amendment to his plea in abatement, whereby he sought for the first time to attack the judgment of the court of ordinary appointing Toll one of the executors of the Thomas estate, the contention being that Toll was a non-resident of Georgia, that he had no such interest in the estate as would authorize his appointment as executor, and that these facts appeared on the face of the record in the ordinary's court, and its judgment was therefore a mere nullity. The plaintiff urged the objection that this amendment came too late, being offered at the second term of the case. The court overruled this objection, but, on demurrer, dismissed the amended plea on the ground that the proceedings in the court of ordinary were regular on their face, and that its judgment was not open to collateral attack. A plea in abatement is essentially a dilatory plea, and must therefore be filed, if at all, at the first term. Civil Code § 5058. Entirely new and distinct grounds for abating an action can not, of course, be set up at the trial term under the guise of an amendment to a plea in abatement filed in due time; a party can not accomplish by indirection what the law declares it is not his privilege to do at all. But counsel for Quillian insist that as the plaintiff was allowed to amend his petition at the trial term, the petition was thereby opened to either demurrer or plea at that term. Civil Code, § 5068. This position is not well taken, however, as that section declares that an "immaterial amendment does not so open the petition" to new and distinct defenses; and this court has held that an amendment which does not so change a plaintiff's petition as for the

first time to make a particular defense available is not to be regarded "material," within the meaning of the section just cited. *O'Connor* v. *Brucker*, 117 *Ga.* 451; *So. Bell Tel. Co.* v. *Parker*, 119 *Ga.* 721 (4). It is true that Quillian demurred to the original petition, on the ground that it did not distinctly allege in what capacity Toll brought suit, and the plaintiff, without invoking any ruling of the court as to this point, voluntarily amended his petition so as to relieve the matter of all doubt. But this amendment was really needless and useless; for the petition as originally framed in terms alleged that Toll was "a duly qualified executor of the will of Grigsby E. Thomas Jr.," lately deceased. It follows that the amendment to the plea in abatement was improperly allowed. Error is assigned in the cross-bill of exceptions upon its allowance, while in the main bill complaint is made that the court subsequently struck the plea on demurrer. The decision made on the question presented by the cross-bill necessarily controls the question raised by the main bill; so that the latter question need not be specifically dealt with. *Monroe* v. *Lippman*, 115 *Ga.* 164.

4. In describing the policy of insurance which was the subject-matter of controversy, the plaintiff alleged that it was issued to Thomas in 1901. In point of fact the policy was dated April 15, 1902. When it was offered in evidence by the plaintiff (it having theretofore been in the custody of the defendants), counsel for Quillian objected to its admission, on the ground that it was not the paper referred to in plaintiff's petition. The plaintiff thereupon offered to amend his pleadings by alleging the correct date on which the policy was issued; but Quillian objected to the proposed amendment, on the ground that the policy offered in evidence "was a different contract of insurance from that originally sued on," and on the further ground that the plaintiff "was seeking to set forth a new and distinct cause of action." The presiding judge very properly treated these objections as trivial, and permitted the plaintiff to amend his petition and then introduce the policy. The policy being otherwise sufficiently described in the original petition, it was not necessary that the plaintiff should allege the date on which it was issued; and any mistake which he may have made in setting forth its date could be cured by appropriate amendment, either by way of striking

from his petition an incorrect statement as to the time when Thomas procured the policy, or by inserting the correct date in lieu of that stated. The policy was not " declared on," but its retention by the defendants under a pretended claim of right was alleged by way of inducement to show the plaintiff's right to the relief for which he prayed.

5. The case turns upon the interpretation to be given the written agreement, set out in full in the foregoing statement of facts, whereby Quillian undertook, upon the conditions therein stated, to advance to Thomas the money with which to pay a past-due quarterly premium on the policy. This agreement and the assignment of the policy were executed cotemporaneously, and are to be regarded as evidencing the contract between the respective parties, inasmuch as the written agreement, signed by Quillian, discloses upon what terms the assignment of the policy, signed by Thomas, was executed and delivered to Johnson. It is conceded that Quillian had no insurable interest in the life of Thomas at the time this contract was entered into. The former, however, insists that as the policy was taken out by Thomas on his own life, in which he undoubtedly had an insurable interest, the policy itself did not evidence any wagering contract, and that Thomas had a right to assign it to whomsoever he saw fit, by way of gift or in pursuance of a contract of sale or pledge. In support of this position, the cases of *Union Fraternal League* v. *Walton,* 109 *Ga.* 1, and *Ancient Order United Workmen* v. *Brown,* 112 *Ga.* 554, are cited and relied on. The decision in neither of these cases was rendered by a full bench. As to the correctness of the doctrine on which these decisions were based, the writer is not committed, nor does he wish to be understood as now expressing any opinion on the subject. Suffice it to say that it does not follow from the recognition given of that doctrine that one who holds a policy of insurance on his own life has any legal right to make it the subject-matter of a wagering contract with another person, whether such person has or has not an insurable interest in his life. See *Exchange Bank* v. *Loh,* 104 *Ga.* 446 ; *Morris* v. *Georgia Co.,* 109 *Ga.* 12. The court below held that the agreement between Quillian and Thomas was a wagering or speculative contract, pure and simple, and for that reason could not be enforced at the

instance of the former. This was, we think, the correct view of the matter, whether the writing be construed by itself or in connection with the oral evidence submitted at the trial, which left the intention of the parties free from all doubt. If Thomas did not die within the ninety-day period, he could, but was not bound to, redeem or repurchase the policy by paying to Quillian the amount advanced to pay the quarterly premium; if Thomas elected to redeem on these terms and actually did so, Quillian would make nothing but would lose interest on the money advanced by him; if Thomas lived, but declined to redeem, Quillian would lose the amount advanced and interest thereon, while Thomas would forfeit all interest in the policy, if the premiums thereafter falling due were not paid. The "stake" which Thomas put up was the policy; the "stake" put up by Quillian was $151.52 in cash. These "stakes" were placed in the hands of Johnson; he was, in gambling parlance, the "stakeholder." The uncertain event was the death of Thomas; he bet he would live, while Quillian bet he would die within the time limited without redeeming the policy. Each day which passed lessened the chances of Quillian to win; so long as Thomas delayed taking steps to redeem his "stake," he from day to day deliberately took the chance of losing it forever. This "stake" was of value at the time it was placed in the hands of the "stakeholder." It is true that the policy had to be kept in life by the payment of a past-due premium, but it was not for that reason valueless. Had the subject-matter of the game of chance been a horse owned by Thomas, it also would have had to be fed; and if Quillian had agreed to feed it for ninety days, on condition that the animal was to be his if Thomas died within that period without redeeming it by paying its board, the transaction would be neither more nor less than a wager, if the value of the horse was out of all proportion to its feed bill. The game actually played was for high "stakes." By risking $151.52 Quillian "stood to win" an amount in the neighborhood of $6,700, after settling with Johnson and paying $1,000 each to two of Thomas's children; by accepting and getting the benefit of this "stake" of $151.52 in ready cash, Thomas "stood to win" for his estate more than $9,800, if he played the game well and, anticipating his death in time, redeemed the policy before he died within the ninety-day period.

On the other hand, both "stood to lose." We cannot differentiate the agreement into which they entered from an ordinary "election bet," which certainly comes under the definition of a wagering contract. *McLennan* v. *Whiddon* 120 *Ga.* 666. Election bets are often ingeniously contrived and more or less cloaked under written agreements touching some perfectly legitimate subject-matter of contract, the real design of them being to make the reciprocal obligations of the contracting parties dependent on the uncertain event of the success or defeat of some popular candidate for office. (See collation of cases, under the head "Gaming," in Century Edition of American Digest, vol. 24, pp. 1538-9, 1543-4.) In other instances the contract is made dependent on the uncertainty of one of the contracting parties marrying on or before a specified date. Id. 1538, citing Chalfant *v.* Payton, 91 Ind. 202, and James *v.* Jellison, 94 Ind. 292. Such agreements have uniformly been held to be mere wagers. In the present case the uncertain event was the death of one of the contracting parties; and the agreement was in no sense a legitimate contract of insurance, but a purely speculative and wagering contract.

6. On the argument here, counsel for the plaintiff in error (Quillian) insisted that, even were this true, the verdict returned under the direction of the court should not be permitted to stand, inasmuch as the parties to this illegal contract were in pari delicto; Toll, the complaining executor, stood in the shoes of Thomas; and therefore the court could not lend its aid to either of the parties really interested in the distribution of the proceeds of the policy, but should have left them as it found them. We recognize the correctness of the proposition, that, as a general rule, neither a court of law nor a court of equity can lend its aid in enforcing an illegal contract or in distributing the fruits thereof. *Garrison* v. *Burns*, 98 *Ga.* 762; *Exchange Bank* v. *Loh*, 104 *Ga.* 446 (3). However, by express statute in this State (Civil Code, § 3671), "money paid or property delivered up" in pursuance of a gaming contract "may be recovered back from the winner by the loser, if he shall sue for the same in six months after the loss." Thus, money or property lost in betting on a horse race may be recovered, if suit therefor be instituted within the statutory period. *Dyer* v. *Benson*, 69 *Ga.* 609; *Doyle* v. *McIntyre*, 71 *Ga.* 673. And money posted as a wager on the result of an

election may be recovered from the stakeholder, if, after notice that the bet has been withdrawn, he nevertheless pays it over to the winner without the assent of the retracting party. *McLennan* v. *Whiddon*, 120 *Ga.* 666. So, also, may money be recovered from an agent by a principal who placed the money in the agent's hands for the illegal purpose of playing the game of "futures." *Clarke* v. *Brown*, 77 *Ga.* 606. In the case now under consideration, it is apparent that Thomas, had he lived, could, by proper legal proceedings, have compelled Johnson, the stakeholder, to surrender to him the insurance policy posted in his hands as a "stake," or, in the event Johnson had delivered the policy to Quillian, the policy could have been recovered from him. And it is equally apparent that had Quillian collected the insurance money after the death of Thomas, his executor, Toll, could have compelled Quillian to account to him therefor, in an action at law brought within six months after Thomas died. Instead of instituting such an action, Toll, as executor, at once brought an equitable proceeding to prevent Quillian from collecting the insurance money, alleging that if he were permitted to collect the money, he might make away with it, and it could not be recovered from him. Toll asserted claim to the policy itself, as the property which had been "staked" by Thomas, and resorted to a court having equity jurisdiction in order that this claim might not be defeated by a payment of the proceeds of the policy by the insurance company to the winner, Quillian. In other words, Toll relied on his statutory right to recover the property posted and lost by Thomas on the bet he made that he would not die before redeeming his policy; and the suit brought was essentially of statutory parentage, though clothed with the frills of equitable pleadings.

7. It only remains to inquire whether or not the trial court did, as contended by counsel for Quillian, undertake to enforce the terms of the illegal contract and distribute the fruits thereof. The fund in controversy did not arise from the illegal agreement, but was the proceeds of a valid policy of insurance on the life of Thomas. It was kept in life by the payment, in behalf of Thomas, of the past-due quarterly premium; Quillian paid over to Johnson, as the agent of Thomas, the money with which to pay this premium, and the money so advanced by Quillian was parted with

by him under the terms of the illegal agreement between him and
Thomas. But the money was received by the insurance company
as the money of Thomas, which it in fact was at the time the pre-
mium was paid; and though it came from an illegal source, this
fact did not operate to vitiate the policy. The insurance com-
pany could not successfully so contend, nor can Quillian. He
can only insist that he paid over the money on a wager, and has
a statutory right to sue and recover the same from Thomas's exe-
cutor. The court gave him credit for this amount, as though he
had brought suit and established his statutory right to recover it.
The court also credited him with the aggregate amount he had
paid to Johnson on the promissory notes he held against Thomas,
the consideration of which was money which Johnson had ad-
vanced to Thomas to enable him to keep up with the recurring
premiums falling due on the insurance policy. Quillian's purpose
in paying off these notes was to comply with the terms of his
illegal contract. The court, however, did not allow him credit
therefor on the idea that he had to this extent performed his
obligations under that contract, but upon the purely equitable
theory that these notes represented a valid demand against the
estate of Thomas, which Quillian had discharged, and though the
notes had not been indorsed to him, still he was the equitable
owner of them and was subrogated to all the rights of the payee,
Johnson. Thus Quillian received out of the proceeds of the policy
payment of every legal demand he had against the estate repre-
sented by the plaintiff. That the court did not undertake to
enforce the terms of the illegal contract is evidenced by the fur-
ther fact that two of the nominated beneficiaries thereunder
("Grigsby E. Thomas IV, and Maria Virginia Thomas," the minor
children of the plaintiff's testator) were entirely ignored, and
Quillian was not called on to pay either of them anything. In
fact, the court directed the jury to find that the entire fund re-
maining after the credits to Quillian were allowed should "be paid
over to the petitioner, as the executor of the estate of G. E.
Thomas Jr." To this estate it belongs, and is subject to the
claims of its creditors and to those of the beneficiaries under the
will of the plaintiff's testator. The verdict directed by the court
was strictly in accord with the written law, with equity, and with
good conscience.

We have not overlooked certain assignments of error touching the admission and rejection of testimony. That admitted over the objection of Quillian related to a conversation between a witness and Thomas, before his death, with respect to his right to redeem the policy; while that rejected was offered by Quillian for the purpose of showing that he did not make a loan to Thomas of the money advanced to pay the overdue premium, but that Thomas sold the policy to him on the conditions named in the written agreement between them. Irrespective of the testimony admitted over the objection of Quillian, a verdict such as that directed by the court was demanded, and the admission of the testimony rejected could not have altered the inevitable result reached. Indeed, as has already been stated, the case turned on the construction to be given the written agreement evidencing the transaction.

*Judgment on main bill of exceptions affirmed; on cross-bill reversed. All the Justices concur.*