KANSAS CITY, M. & O. RY. CO. OF TEXAS
v. McCUNNINGHAM et al.†

(Court of Civil Appeals of Texas. Ft. Worth. May 11, 1912. On Rehearing, June 29, 1912.)

1. CARRIERS (§ 215*)—CARRIAGE OF LIVE STOCK—INJURIES—PROXIMATE CAUSE.

Plaintiff shipped cattle in good condition from nonquarantine territory to destination in similar territory, but necessitating transportation through quarantine territory. By the carrier's failure to have noninfected pens in the quarantine territory, where it was necessary to unload the cattle for feed, water, and rest under federal regulations, it became necessary to unload the cattle in infected pens, requiring that they be disinfected by dipping. For this purpose they were turned over to federal officers belonging to the United States Bureau of Animal Industry, by whom they were negligently dipped in an improper mixture, resulting in loss and injury. Held, that the negligence of the federal officers in dipping the cattle, and not the carrier's failure to provide noninfected pens, was the proximate cause of the injury, for which the carrier was not liable.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 923; Dec. Dig. 215.*]

2. CARRIERS (§ 217*)—CARRIAGE OF LIVE STOCK — INJURIES — CONTRIBUTORY NEGLIGENCE.

Act Cong. June 29, 1906, c. 3594, 34 Stat. 607 (U. S. Comp. St. Supp. 1911, p. 1341), forbids the confinement of cattle shipped in interstate commerce longer than 28 consecutive hours without unloading for rest, etc., but declares that, on the written request of the owner or the person in custody of the particular shipment, the time of confinement may be extended to 36 hours. When plaintiff went to contract for the shipment of cattle from noninfected territory through infected territory, he was informed that, unless the time limit of confinement was extended, the carrier could not get the cattle to noninfected pens before being required to unload them. He was also informed by the conductor who handled the cattle that it would be impossible to reach nonquarantine territory within the 28-hour limit, but that if he would sign a request for the extension of confinement the cattle would reach clean territory and be unloaded in approximately 30 hours. This he refused to do, because he had been so instructed by plaintiff, and at the end

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes
† Writ of error denied by Supreme Court.

of the 28-hour period the cattle were unloaded in infected pens, requiring them to be dipped, in which process they were injured. It was shown that when the cattle reached the place where they were unloaded the 28-hour period had not quite expired, and that it was but 18 or 20 miles to noninfected territory, which could have been reached in two hours, where the cattle could have been unloaded, fed, and watered without being dipped. *Held*, that the refusal of plaintiff's caretaker to consent to the longer confinement of the cattle, under such circumstances, constituted contributory negligence, precluding a recovery for the injuries sustained by the dipping.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 931; Dec. Dig. § 217.*]

Speer, J., dissenting.

Appeal from District Court, Mitchell County; Jas. L. Shepherd, Judge.

Action by Dan McCunningham and others against the Kansas City, Mexico & Orient Railway Company of Texas and others. From a judgment for plaintiffs against the Kansas City, Mexico & Orient Railway Company of Texas alone, it appeals. Reversed and rendered.

H. S. Garrett, of San Angelo, for appellant. Ed. J. Hamner and Geo. T. Wilson, both of Sweetwater, for appellees.

CONNER, C. J. Appellee, Dan McCunningham, instituted this suit March 30, 1910, against the Texas & Pacific Railway Company, the Kansas City, Mexico & Orient Railway Company, the Kansas City, Mexico & Orient Railway Company of Texas, and the Missouri Pacific Railway Company for several thousand dollars' damages to a shipment of cattle made from Toyah, Tex., to Sedan, Kan., April 19, 1909. Later the suit was dismissed as to the Texas & Pacific Railway Company and the Missouri Pacific Railway Company; and the trial against the other two defending railway companies, which were sued as partners (the partnership not being denied), resulted in a judgment against the plaintiff in favor of the Kansas City, Mexico & Orient Railway Company, but in plaintiff's favor as against the Kansas City, Mexico & Orient Railway Company of Texas, for the sum of $2,750, with interest, etc., and the latter company has duly appealed from the judgment.

So far as we think it now pertinent to state, the plaintiff's cause of action rests upon substantially the following allegations: That his cattle were in good condition and shipped from Toyah, a free or nonquarantine territory; that the territory traversed by the two Orient Railways was within the quarantine district; that both of the Orient Railway Companies were negligent in failing to have nonquarantined pens into which the plaintiff's cattle might have been unloaded, fed, and watered; that the line of the Orient Railway Company of Texas extended from Sweetwater, Tex., to Altus, Okl.; that

the line of the Orient Railway Company extended from Altus, Okl., to Wichita, Kan.; that when the cattle arrived over the Orient of Texas at Altus, there then being no pens into which the cattle could be unloaded without danger of infection, the cattle were at once received by the other Orient Company and transported as far as Lugert, Okl., at which place, also without noninfected pens, the cattle were unloaded in quarantined territory, which necessitated, under the requirements of the United States Bureau of Animal Industry, a dipping of his cattle; that later the cattle were transported from Lugert, Okl., to Wichita, Kan., where the cattle were in fact dipped in an emulsion of crude Neodesha oil and then transported on to their destination above the quarantine line; that by reason of the negligent acts charged, and as a result of an improper dipping of the cattle, nine head of the cows were killed outright, four others mortally injured, a number of cows caused to desert their calves, so that four head of the latter died; and that all of the cattle were injured in their value, to the plaintiff's total damage $5,500.

The defendant railways answered, among other things, that the shipment was interstate, and that under the federal laws the cattle could pass through quarantined territory, provided they were not unloaded en route; that the cattle in question would not have been unloaded in quarantined territory and would not have become infected cattle thereby, had it not been for the negligence of the plaintiff and his failure to do what an ordinarily prudent person would have done under similar circumstances; that, the shipment being interstate, the railways were compelled by federal law to unload the cattle for feed, water, and rest at the expiration of 28 consecutive hours, save that the shipper, or person in charge of the stock as caretaker, might, by written request, extend the time of confinement of the cattle to 36 hours; that when the cattle in question reached Altus, Okl., and were received by the Kansas City, Mexico & Orient Railway Company, it was known that it would be impossible to transport the cattle to clean territory and beyond the limits of the infected district before the expiration of 28 hours, and that if the time of confinement should be extended to 36 hours, or less, the railway company would have sufficient time to transport the cattle beyond the quarantined territory; that, in disregard of the care which a reasonably prudent person would have exercised under the same circumstances, plaintiff's caretaker in charge of the shipment refused to permit or request that the time of confinement of the cattle be extended to 30, 32, 34, or 36 hours, or any portion thereof, in consequence of which, upon reaching Lugert, Okl., the cattle were unloaded in the

infected territory to avoid the heavy penalties imposed by the federal law for a violation of the 28-hour limit; whereupon plaintiff's caretaker deserted and abandoned said cattle, and the cattle, after having remained at Lugert for some time, by command of the United States authorities, were reloaded and transported to Wichita, Kan., where they were dipped by requirement of and under the direction of federal officers, supported by superior force, and in a preparation of oil prepared by such officials.

Appellant, in a brief of 141 pages, presents many assignments of error, but in the view we have taken of the case it will be unnecessary to determine many of them; the vital questions being but few. While the appellee, in his petition, made the usual complaints regarding slow movement, rough handling, standing on side tracks, switches, etc., no evidence in support of these allegations seems to be relied upon. At least, if the evidence raises an issue of damage to an appreciable extent, or in any specified amount, other than that arising from the dipping of the cattle at Wichita, Kan., appellee has failed to point it out, and we have failed to find it. As illustrating this conclusion, we cite the testimony of E. E. Everetts, placed in charge of the cattle as caretaker by appellee, who testified: "Q. What sort of treatment—that is, what sort of handling—did you have between Sweetwater and Altus? A. Why, I thought nice handling. Q. No jolting or jarring of the cars? A. No, sir. Q. What sort of treatment did you have after you left Altus, before you got to Lugert? A. Ordinarily it seemed to be mighty rough going in the night there, and they ran mighty slow; and they jerked around considerable at Lugert. Q. Did what? A. Jerked them around. Not to amount to any great deal, while they were unloading them at Lugert. We did make good time over the Orient. We got a good run."

Hence if, in deference to the verdict of the jury, it be assumed that one or both of the Orient Railway Companies were guilty of negligence in a failure to have disinfected pens, a vital question is: Does the evidence support the finding in appellee's favor for the injuries resulting from the dipping of the cattle—the only supported allegation causing damage? We think not, for two reasons:

[1] First. It seems, as before stated, almost, if not quite, undisputed that the only definite damage to the cattle was that caused by dipping in an improper oil. To again illustrate: C. W. Barnhart, a veterinary inspector under the Bureau of Animal Industry, stationed at Wichita, Kan., states that: "The cattle were not dipped in Beaumont oil, but in an emulsion of Neodesha oil, and, as I stated above, I understand this was ordered by Dr. Allen of Oklahoma City." Dr. Allen was the inspector in charge of the quarantine for Oklahoma and Texas. Dr. Jones, under whose immediate supervision the dipping was made, says: "I dipped these cattle in the capacity of veterinary inspector of the Bureau of Animal Industry, Department of Agriculture. * * * After arriving there [Wichita], I was unable to obtain a supply of Beaumont oil, and received further instructions from Dr. Allen to use the other oil. * * * I assumed full charge during the dipping and until they were released. These cattle were not dipped in Beaumont oil, because we could not obtain a supply in Wichita." The appellee, Dan McCunningham, among other things, testified: "I saw these cattle after they were put in the pasture at Sedan. They were very badly burned from the effect of the dipping—burned from being dipped in too heavy oil. * * * If these cattle had been dipped in oil, light oil, it would not have burned them so much. If they had been dipped in Beaumont oil, it would have burned them some little, but not so much. Cattle is injured with any kind of dip; but the injury would have been a light per cent., if dipped in the lighter oil. It would have hurt the cattle if they were dipped in the heavy oil; the cattle showed to have been burned by the heavy oil." J. A. Kannaman, engaged in the live stock business, testified that the cattle "were dipped in crude oil and badly burned from the effect of it. It has a material effect upon their fattening propensities." Fred Kingdon, a commission man, testified for the plaintiff: "I have had eight or nine years' experience examining cattle and pastures and in examining cattle on pastures and seeing cattle that had been dipped or immersed, although I never saw cattle, before this drove, that had been dipped or immersed in oil preparation. I have seen thousands of cattle that have been dipped in the regulation formula, but none that had been dipped in oil, as stated above." Mr. A. D. Melvin, chief of the Bureau of Animal Industry, Washington, quoted from regulation 17, amendment 4, Bureau of Animal Industry, order 143, issued March 27, 1909, the requirements for the kind of dip in which these cattle should have been dipped, as follows: "At any time of the year cattle of the quarantined area or other cattle exposed to or infected with ticks (margaropus annulatus) which have been properly dipped in Beaumont crude petroleum * * * may be shipped interstate subject to such restrictions as may be imposed by state, territorial or district officers at point of destination."

None of appellant's officers, servants, or employés had any controlling voice in the method or substance adopted in dipping the cattle. If it be admitted, therefore, that appellant was guilty of actionable negligence in failing to have nonquarantined pens at Benjamin, Altus, or at Lugert, and in unloading the cattle at Lugert in infected territory, such negligence was not the proxi-

mate cause of the injuries to the cattle. There was a wholly new and independent cause intervening between the wrongs charged and the injuries inflicted. The proximate cause, in a legal sense, was the dipping in an improper substance, applied by a superior power. The negligence charged could only create liability for such consequences as could have been reasonably contemplated by the carrier at the time. It might have been contemplated that such alleged negligence would result in a case of dipping in the usual ordinary substance; but, in the absence of knowledge to the contrary—and none is shown—it could not have been contemplated that it would necessitate a dipping of the cattle in the unusual and harmful liquid proven. As said by the Supreme Court of the United States, in Milwaukee & St. Paul Ry. Co. v. Kellogg, 94 U. S. 469, 24 L. Ed. 259: "It is generally held that, in order to warrant a finding that negligence, or an act not amounting to wanton wrong, is the proximate cause of an injury, it must appear that the injury was the natural and probable consequence of the negligence or wrongful act, and that it ought to have been foreseen in the light of attending circumstances." This, say our own Supreme Court, in the case of T. & P. Ry. Co. v. Bigham, 90 Tex. 227, 38 S. W. 164, "is probably as accurate a statement of the doctrine as can be given, and is substantially that generally laid down by the authorities." See, also, M., K. & T. Ry. Co. of Tex. v. Belcher, 89 Tex. 428, 35 S. W. 6; Hassler v. G., C. & S. F. Ry. Co., 142 S. W. 629. It follows, therefore, that appellant was not liable for the injuries shown, the actionable negligence on its part proven not being the proximate cause, but, on the contrary, that of an independent, superior force, for whose acts appellant cannot be held. See Hutchinson on Carriers, §§ 206, 210b, 210c; So. Ry. Co. v. Heymann, 118 Ga. 616, 45 S. E. 491; s. c., 122 Ga. 60, 50 S. E. 342; Memphis R. R. Co. v. Reeves, 77 U. S. 176, 19 L. Ed. 909; Am. Ex. Co. v. Mullins, 212 U. S. 311, 29 Sup. Ct. 381, 53 L. Ed. 525.

[2] Second. But, if it be yet further assumed in appellee's favor that the failure to provide noninfected pens and the unloading of appellee's cattle in the infected territory constituted negligence, and that such negligence caused appreciable injury to the cattle, other than that resulting from the improper dipping, or that appellant's negligence cooperated with the negligence of the federal officers in causing the injuries actually shown, then at least a majority of us are of the opinion that the failure or refusal of E. E. Everetts, the caretaker of the cattle and appellee's representative, for whose acts appellee must be held liable, to make request for an extension of the time of the cattle's confinement, as provided in the act of June 29, 1906 (Feb. St. Ann. Supp. 1909, p. 43), constitutes such contributory negligence as precludes any recovery by appellee. The act referred to forbids in interstate shipments confinement of cattle or other animals by any common carrier in cars, boats, or vessels of any description for a period longer than 28 consecutive hours, without unloading the same in a humane manner into properly equipped pens for rest, water, and feed for a period of at least 5 consecutive hours, unless prevented by storm or by other accidental or unavoidable causes which cannot be anticipated or avoided by the exercise of due diligence and foresight; heavy penalties being imposed by the act for a violation of this regulation. But it is especially provided "that upon the written request of the owner or person in custody of that particular shipment * * * the time of confinement may be extended to 36 hours." It is undisputed in the evidence that E. E. Everetts was appellee's representative and the caretaker of the cattle in the shipment, and that when he went to the depot at Sweetwater to make the contract of shipment with the agent of appellant at that place Everetts was informed that, unless the time limit was extended, the railway company could not get the cattle through to clean pens before unloading them. He was also so informed by the conductor who handled the cattle from Sweetwater to Altus, and also by the agent at Altus. It seems, also, that J. B. York, the conductor of the train which transported the cattle from Altus to Lugert, fully explained to Everetts his inability to reach clean or nonquarantined territory within the 28-hour limit of the act, but that if such a release was signed the cattle would reach clean territory and be unloaded in approximately 30 hours. Everetts at all times, however, positively refused to make the request for an extension of time, as provided in the act of Congress; his reason therefor being that he had been so instructed by appellee. It is also undisputed in the evidence that when the cattle reached Lugert the 28-hour period had not yet quite expired, and that it was but 18 to 20 miles from Lugert to Center; the latter place being located beyond the quarantine line and in noninfected territory, where the cattle could have been unloaded, fed, watered, and rested without danger of infection, and without being subject to dipping. The testimony further shows that at the usual rate of speed the cattle could have been transported from Lugert to Center within two hours at most; and appellee himself testified to the effect that if the cattle had been properly fed and watered their confinement on board of the cars for two hours longer would not have injured them. The question, then, is: Can appellee, under such circumstances, by an arbitrary order or direction to his agent, Everetts, be relieved from the consequences

of Everetts' failure and recover for injuries that could have been so easily avoided?

Appellee insists that there is no duty imposed by law upon the caretaker or owner of cattle being transported to sign the 36-hour release, this being, as contended, a favor to the railroad, and which is entirely optional with the owner or caretaker; that to hold otherwise places it within the power of the carrier to entirely abrogate the 28-hour law and avoid the consequences of its failure to perform its duty to provide necessary pens to handle native cattle. But we cannot concur in these contentions. It is true that it is the duty of the carrier to provide necessary pens; but no law to which we have been cited specifically required their location at either Altus or Lugert, and the persons in charge of the shipment, both employés of the railway company and of appellee, were confronted with a condition—a fact then well understood and known—that there were no disinfected pens, either at Altus or at Lugert, within which the cattle could be unloaded without danger of infection; and that by a simple extension of the period permitted by the act of Congress the cattle could and would have been transported to and unloaded in noninfected territory. Under such circumstances, we think without question it was the duty of the caretaker to have made the written request provided for in the act. Under the circumstances, his nonaction was equivalent to affirmative action, directly bringing about the necessity for dipping.

The case of Waco Artesian Water Co. v. Cauble, 19 Tex. Civ. App. 417, 47 S. W. 538, was a suit for damages because of a breach of contract to furnish water to a herd of beef cattle. Among other things, the trial court charged that: "Upon the failure of the defendant to furnish plaintiff's cattle with water, it became the duty of plaintiff, or his representative in charge of said cattle, to use ordinary care and diligence to provide said cattle with water, such as would not injure said cattle." And the Court of Civil Appeals for the Third District, in disposing of the case (the judgment being affirmed), say, inter alia, that: "But for an intervening principle the defendant would be bound to pay for all injury that would have resulted from the breach of the contract, if plaintiff had done nothing to prevent the full consequences of the breach. That principle is that he was bound to use ordinary care to prevent such consequences, as far as he could by reasonable effort and expense."

The case of Walker v. Herron, 22 Tex. 56, was one in which Herron sued Walker for damages sustained in consequence of a contagious disease taken by Herron's horses from those of Walker, and which Walker brought into the range where Herron's horses had been previously kept. There was testimony on the part of Walker that he had given warning to his neighbors, including appellee, to keep their horses away from his own on account of the disease which had broken out among them. The court say: "The proof is that after the defendant [Walker] bought his stock and brought it upon his premises the disease made its appearance. There is no pretense that he knew that the stock was diseased when he brought it there. He then undoubtedly had the right to keep it there upon his own premises, warning his neighbors to keep their stock away, and using all the means reasonably within his power to prevent the communication of the disease. If, as soon as he discovered or had reason to believe the stock were infected with a contagious disease, he gave such warning and used such means to prevent injury to them, and they negligently suffered their stock to remain exposed to the contagion, and injury resulted to them, he clearly could not be held liable therefor. * * * It was as much the duty of the plaintiff, as it was of the defendant, when the disease was discovered, to use all the care and diligence reasonably within his power to prevent the communication of the disease. When warned of the danger, it was equally incumbent on him to keep his stock away from the defendant's, as it was upon the defendant to keep his upon his own premises and prevent their running at large, communicating the disease to the plaintiff's stock. It was not correct to say, in effect, that, because the plaintiff's stock had previously run at large in the range where the defendant's now were, it was not negligence in the plaintiff to suffer his to remain there as before. If there was danger, and he was apprised of it, and by the use of ordinary care and diligence could have avoided the injuries to his own stock, his failure to do so was negligence, and he cannot hold the defendant responsible." The court further quoted with approval from Mr. Greenleaf, as follows: "The case of faults on both sides is one of great embarrassment; but the result of the authorities seems to be this: That the burden of proof is on the plaintiff to show that, notwithstanding any negligence or fault on his part, the injury is in no respect attributable to himself, but is wholly attributable to the misconduct on the part of the defendant as the proximate cause."

In the case of Warren v. Stoddart, 105 U. S. 224, 26 L. Ed. 1117, the Supreme Court of the United States thus states the rule that we think applicable here, viz.: "The rule is that, where a party is entitled to the benefits of a contract, and can save himself from a loss arising from the breach of it at a trifling expense, or with reasonable exertions, it is his duty to do it; and he can charge the delinquent with such damages only as, with reasonable endeavors and ex-

pense, he could not prevent"—citing a number of authorities.

In 13 Cyc. p. 71, the author says: "Where an injured party finds that a wrong has been perpetrated on him, he should use all reasonable means to arrest the loss. He cannot stand idly by and permit the loss to increase, and then hold the wrongdoer liable for the loss which he might have prevented." See, also, W. U. Telegraph Co. v. Jeanes, 88 Tex. 232, 31 S. W. 186; Wabash Ry. Co. v. Campbell, 219 Ill. 313, 76 N. E. 346, 3 L. R. A. (N. S.) 1092.

As in opposition to the foregoing authorities, our attention has been called to the cases of G., C. & S. F. Ry. Co. v. Trawick, 80 Tex. 270, 15 S. W. 568, 18 S. W. 948, T. & P. Ry. Co. v. Payne, 99 Tex. 46, 87 S. W. 330, 70 L. R. A. 946, 122 Am. St. Rep. 603, St. L., A. & T. Ry. Co. v. Mackie, 71 Tex. 491, 9 S. W. 451, 1 L. R. A. 667, 10 Am. St. Rep. 766, A., T. & S. F. Ry. Co. v. Lucas (Sup.) 144 S. W. 1126, and Tex. Cen. R. R. Co. v. Perry, 147 S. W. 305, by this court. We do not care to extend this opinion by any lengthy discussion of those cases; but we think they are all clearly distinguishable from the one before us. In the Trawick Case, it does not appear that the plaintiff, under the circumstances, had the opportunity to use pens, other than those of which he complained, or that he could, at trifling effort or expense, have repaired the pens used. Moreover, the court there was discussing a requested charge, the effect of which would be to relieve defaulting railways of a continuing duty imposed by our statute to provide sufficient pens, because of the mere fact that the shipper might know of and could repair defects. This the court correctly held could not be done.

Tex. & Pac. Ry. Co. v. Payne, 99 Tex. 46, 87 S. W. 330, 70 L. R. A. 946, 122 Am. St. Rep. 603 (and that of A., T. & S. F. Ry. Co. v. Lucas [Sup.] 144 S. W. 1126, is the same in principle), was the case of an ejected passenger, whose undisputed contract for carriage had thus been breached because an agent of the railway company had wrongfully failed to indorse the passenger's ticket with the proper evidence of his right to continued passage. The principal question discussed was whether the refusal to properly indorse the ticket constituted such complete breach of the contract as to entirely preclude a recovery, and it was held not; the question of whether the passenger was required to pay additional fare being incidentally treated as controlled by the case of St. L., A. & T. Ry. Co. v. Mackie, 71 Tex. 491, 9 S. W. 451, 1 L. R. A. 667, 10 Am. St. Rep. 766, in which it is said, among other things, "It is rendered probable by the evidence that he [the complaining passenger] had not money sufficient to pay this demand [for extra fare] and pay the other necessary expenses," and in which, also, the court was discussing an omission of a charge, relating to which it was further

said: "The charge asked would have made his failure to pay the additional sum demanded a defense to the entire action, if by its payment the appellee would have received the services and accommodations he was entitled to receive, without such additional payment. A charge leading to such a result was not only misleading but clearly erroneous, and was properly refused."

In the case of Tex. Cen. R. R. Co. v. Perry, the majority of this court merely held that the failure of a passenger to leave a cold depot for a nearby hotel did not raise the issue of her contributory negligence; it appearing that she was very old; that the night was dark; that she was momentarily expecting the arrival of one appointed to meet her; and it not being shown, either that she knew the precise location of the hotel, or that she had been requested to repair thereto in sufficient time.

In the case here it can hardly be said that there was a total breach of the contract for transportation, as in the cases of the ejected passengers; for here the cattle were in fact transported and delivered at their destination. The failure to have pens was an incidental omission, similar in nature to the failure of the agent to properly stamp a return ticket, or of a carrier of passengers to have warm and comfortable cars, depots, etc., as provided by statute, amounting to nothing more, in its relation to the contract of carriage, than negligence. And while in one sense the duty to provide suitable pens is a continuing one, it was impossible of immediate performance, and known to be so, in which respect, also, the case is distinguishable from the passenger cases referred to, where the carrier, at the time of the breach, was without excuse for the refusal to continue the transportation. We do not understand the cases mentioned as holding that the plea of contributory negligence is in no case available where there is a violation of a statutory duty. Indeed, the converse has been held. Burnett v. Ft. Worth Light & Power Co., 102 Tex. 31, 112 S. W. 1040, 19 L. R. A. (N. S.) 504.

We conclude that in this case the question is one of negligence, and that the failure of Everetts, the caretaker, to consent and request the further transportation of two hours shown to be necessary, was, under the circumstances, such negligence on Everetts' part, and, hence, on appellee's part, as directly contributed to the results which followed the unloading of the cattle in the infected territory at Lugert, and therefore precludes all recovery in behalf of appellee.

The foregoing conclusions render immaterial all other questions presented by the assignments of error; and, it appearing that the facts were fully developed and are undisputed, it is ordered that the judgment be reversed and here rendered for appellant.

Reversed and rendered.

SPEER, J. (dissenting). I find myself unable to agree to the judgment of reversal and rendition entered by the majority, for the following reasons: It is too well settled to require the citation of authorities that one is liable for injuries of which his negligence was the proximate cause, even though the negligence of a third person contributed to the injury. It is even true that such person is liable where his negligence contributes with the negligence of a fellow servant, or with a vis major. So that, to my mind, applying the test stated by the majority, if appellant could reasonably anticipate the consequences of its negligence in failing to provide suitable pens along its line at proper places, to enable it to comply with the federal statutes in handling appellee's cattle, then it would be liable to him in damages for all the injuries sustained, even though the act of the federal authorities, whether negligent or not, contributed to those injuries. Upon this theory, unless the judgment should be reversed and rendered for appellee's contributory negligence, which I will discuss later, the judgment should be affirmed in its entirety. But if it be the law that appellee can recover only to the extent of the injuries which his cattle would have sustained by a proper dipping (that is, the usual dipping in Beaumont oil), and could not recover for the increased damages by reason of the dipping in Neodesha oil, even then the cause would have to be remanded to enable plaintiff to show, if he could, the extent of the injuries for which he would be entitled to recover. Having recovered judgment below, we should not here render judgment against him after having reversed the case, but should remand for another trial, unless it affirmatively appeared that no case could be shown. I therefore think that in any event the judgment should not be rendered, since the evidence quoted in the majority opinion shows clearly that some damages necessarily followed the usual and ordinary dipping.

This brings me to a consideration of the second point upon which the majority base their judgment in favor of appellant. I do not think the case is one for the application of the defense of contributory negligence at all. Out of deference to the verdict, we must treat the case as one where negligence on the part of appellant proximately causing appellee's injury is shown. The question then arises: Was the act of the shipper, Everetts, in his failure and refusal to make request for an extension of the 28-hour limit under the federal statute, an act of contributory negligence which would deprive appellee of the right which he would otherwise have to a recovery? I shall not discuss separately the authorities cited by the majority, but, in my judgment, they are not only not decisive of the question, but are inapplicable to it. They are without exception, I believe, cases in which there had been a full and complete breach of the defendant's contract, and instances in which the defendant no longer had the opportunity, nor was the duty imposed upon it, to perform the act which the plaintiff was held under obligation to perform. In other words, they were cases involving the doctrine of avoidable consequences, none of which are in any wise in conflict with the decisions, most of which are by the Supreme Court, which I shall now discuss as being applicable to the present case.

In G., C. & S. F. Ry. Co. v. Trawick, 80 Tex. 270, 15 S. W. 568, 18 S. W. 948, the contention was made by the appellant that if the plaintiff, a shipper of cattle over its line of railroad, "examined the pens and saw they were not in good condition, but put his cattle therein and failed to provide suitable means to prevent their escape from the pens, then the plaintiff would be guilty of what is termed contributory negligence, and he is not entitled to recover anything on account of loss of cattle escaping from said pens." Of this contention the Supreme Court said: "We think this statute requires railway companies to keep pens for the shipment of cattle, and that they cannot absolve themselves from the statutory duty to keep such as are suitable for the business by showing that they were so badly kept or constructed as to make it contributory negligence upon the part of the shipper to use them." In Tex. & Pac. Ry. Co. v. Payne, 99 Tex. 46, 87 S. W. 330, 70 L. R. A. 946, 122 Am. St. Rep. 603, this court certified to the Supreme Court the question whether or not a plaintiff, who had been wrongfully ejected from a passenger train for the want of a proper indorsement on his ticket, could recover for such ejectment, when it was shown that such consequences could have been avoided by the payment of a small fare, which he refused to make. That court, after a careful review of the question, answered that the plaintiff was entitled to recover damages sustained from the expulsion, and was not required either to purchase another ticket at the starting point, or to pay his fare on the train. To the same effect is St. L., A. & T. Ry. Co. v. Mackie, 71 Tex. 491, 9 S. W. 451, 1 L. R. A. 667, 10 Am. St. Rep. 766, cited in the opinion last referred to. Another case involving the same question is A., T. & S. F. Ry. Co. v. Lucas (Sup.) 144 S. W. 1126, certified by the Court of Civil Appeals for the First District. The question there involved was: "Would the facts referred to bar the right of appellee to recover damages for her ejectment from the train in a proper manner by the conductor, upon her failure to pay fare, or to present any other ticket than the unvalidated ticket upon which she had been refused admission to the train through the gate?" Reaffirming the rule as announced in the Mackie and Payne Cases, the Supreme

·Court, through Mr. Justice Dibrell, adds: "The fact that appellee was notified by the .agent at Houston that she could not ride on the unvalidated ticket, and the fact that she was denied admission to the yards by the gateman, for the reason that the ticket presented was not validated, takes nothing from the force of the rule laid down in the Payne ·Case, and adds no strength to the position assumed by appellants." In the very recent case of *Tex. Cen. R. R. Co. v. Perry* (No. 7,298), not yet officially reported, the ma- .jority of this court held that the facts in evidence did not raise the issue of contributory negligence, where the plaintiff, who had sustained damages by reason of suffering in .a cold waiting room at a railway station, made no effort to seek a hotel, which was .shown to be near the company's depot.

None of these cases are in conflict with the authorities cited by the majority and the many others to the same effect that might be cited, applying the doctrine of avoidable consequences to a broken contract; but the principle upon which they are all based is .a sound·one, and involves a question of public policy which the courts ought not and will not lightly ignore. It is this: A defendant will never 'be permitted to urge, as a defense to an action for damages arising from his breach of contract, that the plaintiff should have done something which the law imposed upon him (the defendant), while the opportunity to perform such act and the duty to do so still remained with the defend-.ant. Having received a consideration to do a particular thing, he ought not to be heard to say that the plaintiff could have performed it as well. In such a case the plaintiff has the right, at all times until a final and .complete breach of the contract, to expect and insist upon a full compliance by the defendant; and the reasoning of the cases which I have cited, and the facts of this .case, suggest that, while the appellee might have treated appellant's default as a breach ·of its contract of shipment, still it is perfectly apparent that such default was not necessarily a final breach of the comprehensive contract to transport his cattle to their final destination. Appellee had the right to .assume to the last that appellant would comply with its contract, notwithstanding the notice received by him, and to insist, as ·he did, that it should do so. With all due deference for the majority opinion, it occurs .to me that if they announce the correct rule of law that the many statutes, both federal and state, imposing upon railway carriers duties ·similar to that under review in this case for the protection of shippers over their lines, come virtually to naught, since such carriers could escape all liability for their violations ·of such statutes by merely giving notice to the shipper beforehand of such dereliction, thereby imposing upon the shipper the ·duty to do something, great or small, .according .to the circumstances of the case, which the law had not only not imposed upon him, but had imposed upon the carrier. As in the Trawick Case, the carrier could say to the shipper: "I have no suitable pens; you see their condition; if you place your cattle in them, they will be damaged, and your contributory negligence will prevent a recovery." And, as in this case, the carrier could say to the shipper: "I cannot observe the 28-hour law, because I have no suitable pens in which to unload your cattle; and if you ship over my line under these circumstances you are guilty of contributory negligence in not waiving your right to insist upon an observance of the statute, and will not be permitted to recover damages for its breach." I think a sound public policy requires a different holding, and the judgment in this case ought to be affirmed, or at least the cause remanded for another trial.

### On Rehearing.

CONNER, C. J. Appellee presents motions for rehearing, for additional findings of fact, and to certify the questions involved to the Supreme ·Court. Consideration of these several motions has brought about no change in the views as originally expressed, save that in deference to the insistence of appellee we all find on the issue of proximate cause that Dr. Allen was specially authorized by the Chief of the Bureau of Animal Industry "to supervise the dipping of the cattle in question in a 20 per cent. emulsion of crude oil, subject to permission of the state officials at destination," and that this instruction is broad enough to authorize the selection of the crude oil shown to have been used. In all other respects, the motion for additional findings is overruled. The motion to certify is also overruled, inasmuch as a writ of error lies to the Supreme Court.

As to the motion for rehearing, the majority wish to say that, if in error on the question of proximate cause, it must yet certainly be true that the plaintiff is chargeable with contributory negligence by the undisputed evidence. In other words, that if it be conceded that the injuries to appellee's cattle were such as, under the circumstances, might reasonably have been contemplated as a result of negligence in a failure to have suitable pens, it is nevertheless true that the caretaker of the cattle, with full knowledge of all of the circumstances, and at appellant's command, deliberately and knowingly refused to say the word that would so readily and without hazard have wholly avoided the consequences of which complaint is now made. The caretaker's refusal was appellant's refusal, and constitutes, in our judgment, contributory negligence. The majority therefore adhere to the views originally announced by them, and conclude that the motion for rehearing should be overruled.

SPEER, J., dissenting as before.