WESTERN & ATLANTIC RAILROAD CO. *v.* BEASON.

1. A defense established by the positive and uncontradicted testimony of unimpeached witnesses can not lawfully be arbitrarily disregarded.
2. The trial court erred in admitting, as a part of the res gestæ of the casualty under investigation, a narrative given by the plaintiff's deceased husband touching the manner in which he was injured.

Argued January 3,—Decided January 24, 1901.

Action for damages. Before Judge Calhoun. City court of Atlanta. December 11, 1899.

*Payne & Tye*, for plaintiff in error.
*C. T. Ladson* and *C. T. Hopkins*, contra.

LUMPKIN, P. J. Mrs. Ada A. Beason obtained a verdict against the Western and Atlantic Railroad Company for the homicide of her husband. The company excepted to a judgment overruling its

motion for a new trial.    This motion contained many grounds;
but, in the view we take of the case, it is unnecessary to deal spe-°
cifically with all of them.    Under the evidence as it appears in the
record, the plaintiff was not, in our judgment, entitled to recover.
We shall accordingly confine ourselves to a discussion of this prop-
osition, and of a question presented in two of the grounds of the
motion for a new trial, relating to the admission of evidence.    The
remaining grounds relate to matters which will not probably arise
on another trial, or present questions of law which are well settled.
While some of the rulings with respect to these matters were
not strictly correct, there were no errors, save those dealt with in
headnotes, which would have called for the granting of a new trial.

1. The material facts as to which there was no controversy were,
in substance, as follows: Beason, the deceased, was in the employ-
ment of the defendant company in the capacity of brakeman.    On
the night of his death his duty required him to ride upon a freight-
train which left Atlanta for Chattanooga, Tenn.    While riding
thereon he was thrown to the ground and was run over, thus re-
ceiving injuries from which he died.    The cause of his fall was the
sudden coming apart of the train.    The two cars which separated
when this happened were equipped with "Janney couplers."    A
part of the apparatus composing such couplers was a "knuckle-
pin."    After the catastrophe it was discovered that the particular
pin belonging to the couplers connecting the two cars last men-
tioned had broken in two, and only the upper portion of it was found
in place.    But for the breaking of this pin, the calamity would not
have happened.    The breaking of knuckle-pins is of rare occur-
rence.    The office of a knuckle-pin is not to bear the main strain
or pull which the locomotive exerts in drawing a train, but to hold
the different portions of the coupling apparatus in proper positions
to bear suitably upon each other and thus keep them connected.
The upper part of a pin broken like the one under consideration
might be long enough to still have sufficient holding power or
"purchase" to keep the couplers together during the movements
incident to the starting of a train and the running of it for a con-
siderable distance.

Assuming, for the purposes of this argument, that the deceased
was free from fault, the case on its merits turns upon the question
whether or not the company, relatively to him, was guilty of any

negligence with respect to the broken knuckle-pin. The verdict necessarily embraced a finding that such negligence existed. After a very careful examination of the brief of evidence, we feel constrained to hold that this finding was wholly unwarranted. The company proved by affirmative, direct, and positive testimony, given by witnesses who were unimpeached, and who, as to the physical facts to which they testified, were, we think, uncontradicted, that this very pin was inspected only a few minutes before the train was started and was then intact and apparently in sound condition; that the break was fresh and quite recent, and that there was a flaw in the pin, discoverable after the break, but not so before, except by exceedingly close and critical examination. Opposed to this, the plaintiff proved that a knuckle-pin was much more likely to be broken by the jars and strains which it would receive in a railroad yard during the progress of drilling and switching than through any pull or pressure to which it would be subjected from the starting of a train in the ordinary manner or the drawing of it along the track. In this connection witnesses for the plaintiff, in reply to hypothetical questions propounded to them, testified, in effect, that a knuckle-pin which had successfully withstood the shocks incident to the making up of such a train as the one under consideration would not probably break or come in two from such a starting or from such running as pertained to this train on the night in question.

It will have been gathered from the foregoing that the plaintiff's theory was that the pin had been broken in two before the train started; that it had holding power or "purchase" enough to keep the proper portions of the coupling appliances in due juxtaposition till the train reached the point where the disruption occurred; that then, for some reason, the pin lost its hold, the couplers came apart, and the calamity ensued. Upon this theory were based the contentions that the company had furnished a broken pin for this train on the occasion in question; that it was negligent in so doing, and that its negligence in this respect was attributable to a want of ordinary diligence in the matter of inspection. On the other hand, as will have been seen, the defendant's theory was that the pin entire was in its proper place when the train started; that there was in the pin a latent defect, in the nature of a flaw, and that for this reason it broke and came in two en route. Its contentions were, that it had observed ordinary and reasonable care and diligence

both as to the furnishing and inspection of the pin, and that the calamity was a mere casualty or unavoidable accident which could not by the exercise of such diligence have been foreseen or prevented.

The law relating to the duty of a master to his servant, in a case like the present, is well settled. See sections 2611 and 2612 of the Civil Code, from a reading of which it will clearly appear that if the defendant's contentions of fact be accepted as the truth of the case, it is not liable. We are convinced that these contentions were fully established. If several of the company's witnesses did not commit perjury, a perfect legal defense was made out. It can not be justly or fairly said that the jury were warranted in finding that these witnesses did commit perjury, unless they were in some way impeached, contradicted, or discredited. There is, in our opinion, nothing in the evidence supporting the position that they were. They testified directly and positively to physical facts which no witness undertook to deny. The testimony of the plaintiff's witnesses was based mainly on theories, consisted largely of mere opinions, and was really not in conflict with that of the defendant's witnesses. The opinions expressed as to the capacity of knuckle-pins and what would occur with reference to them related to knuckle-pins generally; that is, to sound knuckle-pins. No witness ventured to swear that a knuckle-pin like the one which broke — one having a latent defect in it — could not, after remaining intact under the shocks and jars it received in the company's yard, have come apart from the strain or pressure incident to the starting of the train or the movements of it which preceded the catastrophe. There is no real inconsistency between the testimony for the plaintiff and that for the defendant as to this controlling question. All of the testimony on both sides is consistent with the theory that the defective pin held together through all the yard movements and received the last strain it could possibly stand after the train had left the yard and was proceeding to its destination. Our conclusion is that the jury had no right to arbitrarily assume that the defendant's witnesses were unworthy of credit, or for any other reason to disregard their testimony, which was not met by the plaintiff and which therefore demanded a verdict in favor of the company. See, in this connection, *Morris* v. *Insurance Co.*, 106 *Ga.* 479; *South Carolina R. R. Co.* v. *Powell*, 108 *Ga.* 437; *Georgia Southern Ry.*

*Co.* v. *Sanders,* 111 *Ga.* 128; *Georgia Southern Ry. Co.* v. *Thompson,* Ibid. 731.

The court, over the objection of counsel for the defendant company, permitted two witnesses to testify to accounts given to them by the deceased after he had fallen from the train, touching the place upon the train at which he had been riding, and explaining the manner in which he was thrown to the ground and injured. This evidence was admitted as a part of the res gestæ. We think it should have been excluded. What the injured man said to the witnesses was manifestly a mere narrative of a past occurrence. His statements, notwithstanding the fact that he was suffering great pain, were made deliberately and connectedly. They were in no sense exclamatory, and manifestly did not proceed from him as part and parcel of the catastrophe. It is true these statements were made within a few minutes thereafter; but, in determining whether declarations should be received as a part of the res gestæ of an occurrence, the mere question of the lapse of time is not controlling. The real test is: were the declarations a part of the occurrence to which they relate, or were they a mere narrative concerning something which had fully taken place and had therefore become a thing of the past? See *Augusta R. R. Co.* v. *Randall,* 79 *Ga.* 304; *Savannah Ry. Co.* v. *Holland,* 82 *Ga.* 257; *Poole* v. *Railway Co.,* 92 *Ga.* 337; *Roach* v. *Railroad Co.,* 93 *Ga.* 785; *Electric Ry. Co.* v. *Carson,* 98 *Ga.* 652; *Weinkle* v. *Railroad Co.,* 107 *Ga.* 367; *Howard* v. *State,* 109 *Ga.* 137, 141.

> *Judgment reversed. All the Justices concurring.*