19126.   PENN MUTUAL LIFE INSURANCE CO. *v.* BLOUNT *et al.,* trustees.

DECIDED MARCH 6, 1929.   REHEARING DENIED APRIL 9, 1929.

*Callaway & Howard, Fullbright & Burney,* for plaintiff in error.

*Fleming & Fleming,* contra.

LUKE, J.   In 1923 E. Hosea Blount et al., as trustees, brought their action against the Penn Mutual Life Insurance Company on a $5,000 policy written on the life of Ransom A. Bell. The trial judge overruled the defendant's demurrers to the petition, and it excepted. In 33 *Ga. App.* 642, this court affirmed the judgment overruling the general demurrer and certain special demurrers, but reversed the judgment overruling other special demurrers. When

the case was tried the jury rendered a verdict for the plaintiffs. The defendant's motion for a new trial was overruled, and it excepted. The Court of Appeals certified certain questions deemed necessary to the decision of the case, and these questions were answered in 165 *Ga.* 193 (140 S. E. 383). On February 28, 1928, this court rendered its decision, reported in 37 *Ga. App.* 756 (142 S. E. 183), reversing the judgment of the trial court refusing a new trial. The case came on for trial again, and on April 24, 1928, the jury found for the plaintiffs. The insurance company made a motion for a new trial, based upon the general grounds and upon certain special grounds complaining of the charge of the court and its rulings upon the evidence. The court overruled the motion for a new trial, and the case is again here for review.

The crucial question in this case is now reduced to this: Did the insurer ratify its agent's unauthorized delivery of the policy to the insured? Through their counsel, the parties to the case agreed "that the evidence used in a former trial of this case be read into the record of this case, with the right to either party to introduce said former testimony in whole or in part, with the further right to either party to interpose objections to the introduction of any part of said former testimony and have the court's rulings on such objections entered in the record." Under the foregoing agreement, the testimony of P. W. Thompson, which was substantially as follows, was offered in evidence: On October 1, 1922, P. W. Thompson, local agent for the insurance company at Waynesboro, Ga., delivered to Ransom A. Bell, the insured, a $5,000 life-insurance policy dated September 25, 1922, upon condition that the insured would pay Thompson the premium "at a future date." On October 7, 1922, Bell returned the policy to Thompson with a request that the beneficiary be changed; and on the same day Thompson sent the policy in a letter to I. T. Heard, general agent of the insurer. In the letter this language was used: "I am returning the policy for Mr. R. A. Bell so that you can have the beneficiary changed as per his request. . . On receipt of this policy with the above correction, he will pay the same. You will note the enclosed paper that he gave me, the same being signed by him."

Mr. I. T. Heard transmitted the policy to the home office in a letter dated October 10, 1922, addressed to Harrison S. Gill, supervisor, at Philadelphia. In this letter was a request that the

policy be rewritten and made payable to named beneficiaries. That letter also contained the following language: "It seems to us that a simpler way would have been to have the actuary prepare an assignment as above, but we leave the matter to your good judgment. Mr. Bell will pay the first premium as soon as this change is made." On October 10, 1922, I. T. Heard wrote P. W. Thompson as follows: "Policy No. 1030617, Ransom A. Bell, has been sent to our home office in order that the company may make the changes requested in your letter of the 7th," etc. A letter from Harrison S. Gill, supervisor of applications and death claims, addressed to I. T. Heard, General Agent at Augusta, Ga., and dated October 22, 1922, acknowledged receipt of said policy "to be rewritten with change of beneficiary," and stated that a policy was being written as desired. Under date of October 25, 1922, Thompson wrote Heard as follows: "Mr. Ransom A. Bell, insured under policy No. 1030617, died on Saturday night, October 21, 1922, and we have been requested by Mr. E. H. Blount, trustee, to make request for forms so that we can send in proof of death. Please give this your prompt attention." A letter from I. T. Heard, general agent, to Harrison S. Gill, supervisor, dated September 23, 1922, contained the following language: "Enclosed find application of Ransom A. Bell, of Waynesboro, Georgia, for $5,000 on the five year T. A-C to O. L. We are informed that the applicant is a good reliable planter and can well afford to pay for this protection. His habits are good, he enjoys the best of health, and is happily married, and should make us a safe and persisting member."

The rules of the insurer did not permit a policy to be left with an applicant for inspection in advance of the payment of the premium, unless he signed a written form stating that the policy was so delivered. Thompson, the local agent, did not take such writing when he delivered the policy to the insured. The premium was never paid on the policy. The trustees for the beneficiaries in the policy called on Thompson before the insured died and offered to pay the premium, but he refused it on the ground that Bell was not then in good health. (Bell had suffered burns from which he afterwards died.) The trustees then asked Thompson if he considered the policy delivered, and he replied that he did, "with the exception of the premium." Thompson testified: "I don't think that I had any correspondence with the company at Philadelphia

directly, nor that they ever communicated or corresponded with me directly. As far as I remember, my communications in connection with this business were with Mr. Heard, and were either in writing or by conversation."

When Heard received the new policy with change of beneficiaries, ready for delivery to the insured, Thompson talked over the entire matter with Heard, beginning with his delivery of the first policy to the insured, telling him, among other things, of his refusal to accept the premium from the trustees after the insured had been burned. During this conversation Thompson told Heard, in reply to Heard's question as to the circumstances under which the first policy had been delivered, that it was delivered to Bell on condition that he would pay for it on the 14th or 15th, but that he had not done so. This conversation was after these dates. Heard requested Thompson to write him a letter setting out the facts connected with the delivery of the policy, and he wrote that letter on November 7, 1922. The said conversation with Heard while the insured was sick was the first statement made by Thompson of the delivery of the policy to the insured, and the said letter written to Heard at his request was the second. The insured was injured on October 19, 1922, and died on the night of October 21, 1922. Thompson did not know the conditions of the policy, and thought he had a right to deliver the first policy as he did. The second policy was never delivered. It was dated September 25, 1922, which was the date of the original policy. Thompson did not know that the contract of insurance contained this provision: "The contract of insurance shall not be enforced unless the first premium thereon is actually paid during the lifetime and good health of the insured." Thompson testified in this language: "The premium rate for this policy was fixed according to the rules of the company, which require that the rate of premium charged will be that corresponding to the age of insured nearest to the premium date of the policy, which in this case was September 25, 1922, the nearest birthday of the applicant being October 22, 1922.

Besides the foregoing evidence, the plaintiffs introduced policy No. 1030617, issued by the Penn Mutual Life Insurance Company on the life of Ransom A. Bell for $5,000, and dated September 25, 1922, together with the attached written application for the policy. The following testimony of Pierre Heard was also offered by the

plaintiffs: "It is a custom with us, under our practice and rules, to make delivery of a policy by taking a check. We would take a check on New York, New York exchange, when the party is considered good. As to how many days it takes to get a report that the check has been paid, I deposit it and get credit for it the next morning. I would not send it through any mails to New York. It would be deposited in Augusta. I have been doing this for a great many years. Of course, some of the agents know about our accepting a check on premiums. The agents know that we take checks, notes and cash." The defendant introduced certain documentary evidence, the first paper being a letter from Harrison S. Gill, supervisor of applications and death claims, to I. T. Heard, dated September 25, 1922, and reading as follows: "The papers in case of Ransom A. Bell have been approved and policy for $5,000. It is going forward to you promptly. . . I trust policy will be satisfactory and that you will have no difficulty in effecting its delivery." The enclosure referred to in the foregoing letter was as follows: "We herewith transmit, together with first receipt, Policy No. 1030617, on the life of Ransom A. Bell, which by its terms is not to be delivered unless the insured continues in good health." Next was introduced a letter dated October 24, 1922, from I. T. Heard to Harrison S. Gill, which follows: "Enclosed find policy No. 1030617, Ransom A. Bell, with his first receipt attached. Mr. P. W. Thompson, the sub-agent, called at our office today and told us that Mr. Bell died on October 19 as a result of burns sustained in a fire on or about October 19. When this policy was first issued we had just registered it and were about to mail it to Mr. Thompson, when he came in our office and we handed the contract to him. He said that he would have to hold it until October 15, as Mr. Bell had told him that he would not be able to pay for it prior to that time. To-day he tells us that he handed the policy to the applicant and he kept it in his possession four or five days and then asked Mr. Thompson to return it to the company, so that the beneficiary clause could be changed, as requested in our letter of October 10 to you. Mr. Thompson says that he told Mr. Bell that he would have to pay us on October 15, and Mr. Bell then told him he would send him a check on October 14. He failed to do this, however, and died without having given a check, note or any other evidence of indebtedness in settlement of the first premium. We told Mr.

Thompson to-day that he had better write us a letter stating full particulars, so that we could forward it to your department. We hope to receive it to-morrow, and will mail it to you without delay. . . . P. S. We infer from our talk with Mr. Thompson that the family expect us to pay this claim. They have offered him the premium which he refused to accept." Next, the defendant introduced a letter from Harrison S. Gill to I. T. Heard, dated October 27, 1922, in which it was said: "Your letter of the 24th inst. returning policy No. 1030617, Ransom A. Bell, is received. As the policy was not delivered nor the premium paid in accordance with its terms, I have to advise you that the company has no liability under same, and we have therefore cancelled it upon our records."

Sidney A. Smith's testimony, taken by depositions, is substantially as follows: Witness had been secretary of the insurance company since January, 1921. He had no personal knowledge of the insurance matter under consideration. Harrison S. Gill had supervision of the issuing of and paying for all policies. Witness knew nothing of Thompson's extending credit for the first premium of the policy. Neither local nor general agents had authority to write policies or "bind risks." If a policy is in force and the insured wishes to change beneficiaries, the company requires him to sign a written request to that effect. The "Actuarial Department" would handle the matter, and neither Mr. Gill nor any one in his department would know of it. Mr. Gill handled this case throughout. Smith did not instruct the local agent to make a reduction in the premium proportionate "to this period of twenty-two days from September 25 to October 17. The witness said in this connection: "It is customary with our company to require its patrons to pay premiums for a time when they are getting no protection, as in this case,—for instance, a period of twenty-two days."

Harrison S. Gill, sworn for the defendant, testified substantially as follows: He had been supervisor of applications and death claims for the company since February, 1921, and his general duties were to pass upon applications and take charge of death claims and the correspondence relating thereto. The procedure followed is this: The application is matched with the medical examination and sent to the medical department. The papers are then returned to Gill's department for final action, and, if approved, the policy is written in said department and mailed to the general agent. The

course generally followed by this witness when the death of a party is reported is stated by him in this language: "We ascertain from our records whether or not the premium has been paid, and all the facts with reference to the causes of death which in any way may pertain to the payment of the claim, and if any question arises" as to the company's liability, the entire matter is referred to the insurer's general counsel for advice. Then the matter is referred to a committee for final action. Gill testified further that Bell's application for insurance was received at the home office on or about September 25, 1922, and was approved by his department; and that the policy was written and mailed to I. T. Heard, the company's general agent at Augusta; that nothing further was done in connection with this application until October 13, 1922, when witness received a letter from Heard requesting that the beneficiaries be changed; that this letter did not contain any formal request signed by Mr. Bell, but stated that he would pay the first premium as soon as the change was made. Witness acknowledged receipt of this letter on the 17th. "A new policy was written and given the same number as the one returned. Since our records did not show that the premium had been paid or that the policy had actually been delivered to the insured, the original document was, in accordance with our regular practice, destroyed, as we did not consider that the interest of the original beneficiary had vested, and there was no reason for the company to require the execution of a formal request for change of beneficiary. Changes of this kind are frequently made before the policies are paid for and delivered and put in force; and we regard such changes as we would regard an error that had been made when the policy was actually being typed. . . Had our records shown that the premium had been paid and the interest of the beneficiary had vested, then the company's formal requirements for a change of beneficiary would have been insisted upon, and such a change would have come through the actuary department, and not this department. Further, such change would have required the signature of the insured to the formal request for change." Gill further testified that he knew nothing about the delivery of the policy and the extension of credit to Mr. Bell until October 27, 1922, when he received Heard's letter of October 24, 1922, advising him that Bell had died without having paid the premium. On October 27, 1922, Gill advised Heard

that the policy was canceled, and on November 7 Heard transmitted a letter purporting to have been written by Thompson, setting out the facts concerning the alleged delivery of the policy.

Since the policy had never been delivered, as the company understood the situation, and the premium had never been paid, the insurer thought that no liability attached in so far as the policy was concerned; and when Joseph S. Conwell, the company's counsel, reached the same conclusion, the insurer denied liability under the contract.

Gill testified further that he was familiar "with all phases of this case," and that neither he nor any officer of the company had any knowledge that Thompson was alleged to have extended credit to the insured, and that no officer of the company waived the requirements of the policy "with reference to the payment of the premium during the insured's good health, either by writing or orally." Gill stated that he did not receive "a paper which Mr. Thompson said was signed by Mr. Bell, requesting the change of beneficiary." Gill did not comply with the suggestion in Heard's letter dated October 10, 1922, that the actuary prepare an assignment of the policy, "for the reason that this is a department of original issue, and, so far as our records showed, the policy had never been delivered." When a policy is canceled it is not customary to preserve the first policy. Gill had made a search for the original policy issued to Bell, but it had been destroyed by some of the clerks in the department. As to the time when Bell was getting no protection, Gill testified as follows: "When I rewrote the policy on October 17, 1922, it was dated back to September 25, 1922, because it retained the original number, and the only change that was made was the beneficiary, and it is our custom to follow the same date as the original policy. I did not instruct our local agent to make a reduction in the premium proportionate to this period of twenty-two days from September 25 to October 17. Under such circumstances as these it is customary with our company to require its patrons to pay premiums for a time when they are getting no protection, as in this case, for instance, a period of twenty-two days."

Joseph S. Conwell testified that he was connected with the law firm which was general counsel for the insurer; that the Bell case had been referred to him and that he had no personal knowledge of the actual happenings in that case.

■ In special ground 1 the plaintiff in error complains that the testimony of P. W. Thompson, its local agent, was illegally admitted "as a circumstance to show . . ratification," over the objection that it was admissible only for the purpose of showing "the state of facts which respondents claim movant ratified." The evidence referred to covers eight pages, and includes several letters. The court properly refused to accede to the requst so to limit the jury in its consideration of this evidence.

■ Special ground 2 complains that the court erred in admitting the testimony of Pierre Heard as a circumstance to show ratification, for the reason that it was irrelevant and immaterial to any issue in the case, and was "not shown by any evidence to have been brought to the notice of the company . . so that it could have any operation on the question of ratification." The testimony objected to has been hereinbefore given. The gist of it is that the agents were accustomed to take notes, checks, and cash in payment of premiums, and that "some of the agents" knew about this. We think that the objection was good.

■ In special ground 3 the following excerpt from the charge of the court is alleged to be error: "Actual notice of the unauthorized act may be divided into express and implied. Express notice embraces not only what may fairly be called knowledge, from the fact that it is derived from the highest evidence to be communicated by the human senses, but also that which is communicated by direct and positive information, either written or oral, from persons who are personally cognizant of the fact communicated. Notice by implication arises when the party to be charged is shown to have knowledge of such facts and circumstances as would lead him by the exercise of due diligence to a knowledge of the principal fact." While the foregoing excerpt is quoted from *McLean* v. *Camak,* 97 *Ga.* 812, the last sentence thereof, which has reference to notice by implication, is not, under previous decisions of this court and of the Supreme Court, applicable to this case. In *Penn Mutual Life Ins. Co.* v. *Blount,* 165 *Ga.* 193 (2) (supra), this language was used: "The unauthorized act of an agent, done in the principal's behalf, can not be ratified by the principal without actual knowledge of the act. The provisions of the Civil Code (1910), § 4530, have no application to the subject of waiver as related to conditions imposing forfeitures in contracts of insur-

ance." In this same case, after stating that there could be no ratification by the company of the unauthorized delivery of the policy "without actual knowledge of the agent's act," this court, in 37 *Ga. App.* 756 (supra), said: "It follows that in a suit against the company in behalf of the beneficiaries named in the policy, to recover under the policy, a charge, with reference to knowledge by the defendant of its agent's act in delivering the policy to the applicant without collecting the initial premium, that the knowledge of facts by the defendant which would put a reasonable person on inquiry is notice of facts to which such inquiry might have led, is an incorrect statement as to the law applicable to the case, and necessitates the grant of a new trial to the defendant." In this connection see *Wiley* v. *Rome Ins. Co.,* 12 *Ga. App.* 186 (76 S. E. 1067). Under the law of this case, therefore, implied notice did not properly have a place in the charge, and the last sentence of the foregoing excerpt was erroneous and cause for a new trial.

4. We now turn our attention to the main question in the case, to wit, ratification. We quote from *Penn Mutual Life Ins. Co.* v. *Blount,* 33 *Ga. App.* 642 (127 S. E. 892) : "The actual payment of the first premium during the lifetime and good health of the assured was a condition precedent to the liability of the insurer, and neither a local agent nor a general agent of the company could waive such condition." Of course knowledge of such agents as to the unauthorized delivery of the policy would not be imputed to the company. The company, however, would be bound by the unauthorized act of its agent if it subsequently ratified the act. See 33 *Ga. App.* 642 (1-c), supra. This ratification must be based upon actual knowledge of the agent's act, but such knowledge may be shown by either direct or circumstantial evidence. See this same case, 37 *Ga. App.* 756 (2) (supra). The question presented here then is this: Does the circumstantial evidence sustain the verdict finding ratification by the company?

We shall now advert to some of the evidence most strongly relied upon to show ratification. The local agent, Thompson, testified that he knew of no instructions as to the delivery of policies except those appearing in the pamphlet of rules issued by the company. On page 36 of that pamphlet the following appears: "Policy must not be delivered by an agent unless the insured be alive, in good

health, and in insurable condition at the time of delivery, which must be within sixty days from the date of the examination. If doubt exists the agent must return the policy and receipt at once with full statement of facts." Only thirty-three days had elapsed between the medical examination on September 21 and the return of the policy to the home office on October 24. The application for insurance, which is a part of the insurance contract, stipulates as follows: "The contract of insurance shall not be in force unless and until a policy shall be issued and delivered to me and the first premium thereon actually paid during my lifetime and good health." In the light of the foregoing rule and the provision of the contract, the agent's delay in returning the policy delivered to him on October 1 could not be held to be a circumstance showing notice to the company of the unauthorized delivery of the policy. It appears more reasonable to conclude that the company thought its agent was acting within its rules than that it was acting in violation of the contract of insurance.

True, the instructions did not require the agent to exact prepayment of the premium, and the agent testified that he did not know that prepayment was necessary. That requirement, however, was in the application, the application was a part of the contract, and the agent, the insured, and the insurer were all bound by it. Why should the insurer be held to know, or even to suspect, that the provisions of its contract were being violated because the instructions to the agent did not inhibit such violation?

But it is insisted that the second policy retained the date of the original policy and was practically a duplicate of it, except as to beneficiaries, and that if the original policy was never in force the insurer was undertaking to charge a premium for twenty-three days during which the insured had no protection. In this connection we quote the following testimony of Harrison S. Gill, who was supervisor of applications, and had charge of the matter of issuing policies at the home office of the company: "A new policy was written and given the same number as the one returned. Since our records did not show that the premium had been paid or that the policy had actually been delivered to the insured, the original document was, in accordance with our regular practice, destroyed, as we did not consider that the interest of the original beneficiary had vested, and there was no reason for the company to require the

execution of a formal request for change of beneficiaries. Changes of this kind are frequently made before policies are paid for and delivered and put in force; and we regard such changes as we would regard an error that had been made when the policy was actually being typed. . . When I rewrote the policy on October 17, 1922, it was dated back to September 25, 1922, because it retained the original number, and the only change made was the beneficiary, and it is our custom to follow the same date as the original policy. I did not instruct our local agent to make a reduction in the premium proportionate to this period of twenty-two days. Under such circumstances as these, it is customary for our company to require its patrons to pay premiums for a time when they are getting no protection, as in this case, for instance, a period of twenty-two days." If the insured paid the premium when the policy was delivered, the policy would have been in force, the change in beneficiaries could have been readily made upon proper application therefor by the insured, there would have been no occasion for issuing another policy, and the situation under consideration would never have arisen. We see nothing here to show ratification by the insurer.

But it is said that the agent was instructed to make prompt delivery of the policy. Surely this fact would not be notice to the company that the agent had acted contrary to the contract itself and made the unauthorized delivery of the policy that he did.

We shall now consider the effect of the most important of the letters in the case. The letter of October 7, 1922, written when Thompson, the local agent, sent the policy to Heard, the general agent, in order that it might be sent to the home office for change of beneficiaries, contained this expression: "I am returning policy for Mr. Bell." This letter stated also that when the policy was returned, Bell would pay. We do not think that this letter apprised Heard of the circumstances attending the delivery of the policy. There is nothing especially significant in the expression, "for Bell," or in the statement that Bell would pay the premium when the policy was returned.

Much stress is placed upon certain expressions in the letter of October 10, 1922, wherein Heard sent the policy to Harrison S. Gill, supervisor, at the home office, in order that the beneficiaries might be changed. Among other things, the letter said: "You

will please rewrite the policy. . . It seems to us that a simpler way would have been to have the actuary prepare an assignment as above, but we leave the matter to your good judgment. Mr. Bell will pay the first premium as soon as this change is made." It is said that "If there had been no existing contract, there would have been nothing to assign." Quite true. But, as appears from the testimony of Mr. Gill hereinbefore quoted, he swore in substance that where a policy of insurance is in force and the insured desires a change of beneficiaries, he is required to sign a formal request to that effect, and in such case the matter would be handled through the actuary department and not his department; and that since the company's records did not show that the premium on the Bell policy had been paid, or that the policy had been delivered, he did not consider the policy in force, and, as was customary in such cases, his department handled the matter, and issued another policy. We do not see where the letters referred to, or any other letters in the record, were enough to put the company on notice that the policy had been delivered without payment of the premium, or to show ratification of the unauthorized delivery of the policy.

We see nothing in the testimony of Pierre Heard (hereinbefore quoted in full) that would put the company upon notice that an agent had delivered a policy entirely on credit, or that would indicate that the company had ratified such delivery. We here call attention to the following facts appearing from the record: Thompson, the local agent, testified in substance that he only disclosed his unauthorized delivery of the policy to Heard, and that this information was imparted after the second policy had been issued and received by Heard. Heard, the general agent, testified in substance that he knew nothing of the unauthorized delivery of the policy to the applicant until the new policy had been sent him ready for delivery. Smith, secretary, testified that he knew nothing about the delivery of the policy, and that Harrison S. Gill had supervision of the writing and issuing of all policies and the delivery of them to the agents, and that "Mr. Gill handled this case throughout." Gill, whose duty it was to handle the Bell matter, and who actually did so, testified that he knew nothing about the delivery of the policy and extension of credit to Bell until October 27, 1922, when he received Heard's letter advising him that Bell had died without having paid the premium on the first policy.

In short, with the exception of Thompson, who actually delivered the policy to Bell, every witness in any way connected with the company denied knowledge of the unauthorized delivery of the policy until after the new policy had been issued. In the interesting case of *Georgia Railway & Electric Co.* v. *Harris,* 1 *Ga. App.* 714 (57 S. E. 1076), Judge Powell, speaking for the court, gave a very lucid discussion of the province of the court and jury in dealing with circumstantial evidence in civil cases. We quote the first headnote of that case: "Where a plaintiff in a civil case supports his action solely by circumstantial evidence, before he is authorized to have a verdict in his favor the testimony must be such as to reasonably establish the theory relied upon, and to preponderate to that theory, rather than to any other reasonable hypothesis. (*a*) While in such cases the sufficiency of the evidence is for the jury, yet before there is, in legal contemplation, any evidence for their consideration, the circumstances shown must in some appreciable degree tend to establish the conclusion claimed. (*b*) A mere scintilla of inconclusive circumstances, giving no scope for legitimate reasoning by the jury, does not carry the burden of proof." In *Neill* v. *Hill,* 32 *Ga. App.* 381(2-*b*) (123 S. E. 30), it was said: "A fact can not be established by circumstantantial evidence which is perfectly consistent with direct, uncontradicted, reasonable and unimpeached testimony that the fact does not exist." The same rule is stated in *Frazier* v. *Ga. R. &c. Co.,* 108 *Ga.* 807 (33 S. E. 996), as follows: "When a plaintiff's right to recover depended upon the establishment of a particular fact, and the only proof offered for this purpose was circumstantial evidence from which the existence of such fact might be inferred, but which did not demand a finding to that effect, a recovery by the plaintiff was not lawful, when, by the positive and uncontradicted testimony of unimpeached witnesses, which was perfectly consistent with the circumstantial evidence relied on by the plaintiff, it was affimatively shown that no such fact existed."

In the case at bar, every circumstance relied upon to show actual knowledge on the part of the insurer of the unauthorized delivery of the policy and ratification of that delivery is perfectly consistent with the direct, reasonable, and unimpeached testimony of every witness testifying that he had no such knowledge. The court erred in overruling the general grounds of the motion for a new trial.

*Judgment reversed. Broyles, C. J., concurs, Bloodworth, J., dissents.*