### ARNALL MILLS v. SMALLWOOD.
### No. 7020.

Circuit Court of Appeals, Fifth Circuit.
Dec. 16, 1933.

HUTCHESON, Circuit Judge, dissenting.

Harry L. Greene, of Atlanta, Ga., for appellant.

Sidney Holderness, of Carrollton, Ga., and J. Caleb Clarke, of Atlanta, Ga., for appellee.

Before BRYAN, SIBLEY, and HUTCHESON, Circuit Judges.

SIBLEY, Circuit Judge.

The appellee, a fifteen year old girl employed by appellant in its cutting and folding room, in off hours sometimes assisted her father in the weaving room, desiring to learn to be a weaver. While so occupied, the shuttle escaped from the loom operated by her father and put out her eye. She sought compensation under the Georgia Workmen's Compensation Law (Laws 1920, p. 167, as amended), but was held not to have been an apprentice or otherwise under that law, and she then sued at common law alleging negligence, and recovered a verdict. She and her father testified that she was in the weaving room with the knowledge and by the consent of the overseer and the superintendent. They denied it, and together with the president testified that they wished no more weavers, and specially did not wish women as weavers. Otherwise there was no substantial conflict in the testimony regarding the occurrence. In trials at law in Georgia, the issues are confined to those made by the pleadings. Recovery can be had only on the grounds of negligence alleged. Augusta Railway & Electric Co. v. Weekly, 124 Ga. 384, 52 S. E. 444; Atlanta Life Insurance Co. v. Jackson, 34 Ga. App. 555, 130 S. E. 378; Citizens' Bank v. Valdosta Mill & El. Co., 34 Ga. App. 713,

131 S. E. 126. To those grounds of negligence only are the attention and the evidence of the parties directed. The original petition here alleged that the loom was negligently in bad condition in that the picker stick which throws the shuttle from side to side was warped, crooked, and out of line, causing the shuttle to fly out. During the trial, it appeared that the picker sticks on the loom in question were not at fault, and the petition was amended to allege fault in the picker, a leather and steel instrument which actuates the shuttle, and that the shuttle box on the left side in which the picker operated was worn and loose and out of alignment, and that an inspection would have disclosed it, and the failure to inspect and repair was negligence. The court considered that appellee was at most a permittee on the premises for her own ends and not an invitee on any business of the company, so that there would be no liability for the mere bad condition of the premises and machinery, but only for conduct causing danger to her done or continued after she was known to be there, sometimes called "active negligence." Pearson v. Mallory S. S. Co. (C. C. A.) 278 F. 175, 176; Rawlins v. Pickren, 45 Ga. App. 261, 164 S. E. 223; Central of Ga. R. Co. v. Lawley, 33 Ga. App. 375, 126 S. E. 273.

To escape the direction of a verdict against her for want of "active negligence," she again amended to allege that there had been inspection and repair of the loom that morning, the left-hand shuttle box being found out of alignment, and that it had been improperly fixed by putting cardboard between the box and the loom frame, both of iron, the cardboard being liable to be thrown out or to be mashed so that the box would soon come out of line again, would misdirect the course of the shuttle, and cause it to fly out as it did. She also alleged the box was not true, and that she was not warned of its dangerous condition. The evidence showed that shuttles come out of looms not infrequently, but usually do not fly out, because checked by a guard which arrests them. Several things may cause it, there being mentioned a want of alignment or looseness of the shuttle boxes which, like gun barrels, direct the shuttle, a bolt or screw sticking up which may deflect it, a broken thread in the warp, or a roughness in the filling thread carried by the shuttle which may trip it, or some defect in the harness which controls the threads of the warp, or a faulty starting of the loom. One witness for the plaintiff said there were a hundred causes. This loom several hours before the injury began to shoot

the spindle awry, stopping automatically, as it should do. The loom fixer discovered that the left box was out of line and put a cardboard liner under one end and tightened the bolt down so as to bring it in line. It is testified without contradiction that this is a usual, accepted, and effectual way of aligning boxes. The loom ran perfectly afterwards till in the afternoon, when it stopped because the filling thread in it broke. Appellee's father rethreaded the shuttle, put it in the right-hand box and started the loom, when the shuttle returning from the left-hand box jumped through the warp threads about the center of the loom, struck the guard, and escaped under it to strike appellee. She and her father say nothing appeared to be the matter with the loom, that he started it up properly, but that the shuttle should not have come out unless something was wrong. The course of the shuttle was afterwards traced by the thread which remained unbroken. The loom fixer, the overseer, and another weaver testify that the shuttle was replaced, the loom carefully examined, nothing found wrong with it, the box had not become loose or out of line; that the loom was started again without any adjustment or repair, and ran perfectly afterwards. The uncontradicted, unimpeached, and not incredible testimony of these three witnesses demands a finding that there was nothing wrong with the box or its alignment and that it was not left in a dangerous state that morning. If it had become so out of alignment as to direct the shuttle up so as to pass through the work midway across the loom, it would afterwards have frequently failed to drive it into the opposite box. The shuttle may have been improperly placed in the loom, its filling thread may in some way have jerked it, or something may have fallen into the loom to deflect it, or there may have been an unaccountable accident; but it cannot have been due as alleged to a loose or unaligned or untrue box if these witnesses speak true. Their testimony is candid, clear, and reasonable, and unopposed by other witnesses or by circumstances which are irreconcilable with it. They are not impeached by any of the modes known to the law. Their evidence cannot be disregarded just because they are employees of the mill. Chesapeake & Ohio R. Co. v. Martin, 283 U. S. 214, 51 S. Ct. 453, 75 L. Ed. 983; Georgia R. & Banking Co. v. Wall, 80 Ga. 202, 7 S. E. 639; Western & Atlantic R. Co. v. Beason, 112 Ga. 553, 37 S. E. 863. Employment or other relationship of a witness may be considered on the point of his credibility in weighing his against opposing evidence, but is not by itself a sufficient reason for disregarding his testimony. Although the circumstances may support the inference of a fact, if it is shown by direct unimpeached, uncontradicted, and reasonable testimony which is consistent with the circumstances that the fact does not exist, no lawful finding can be made of its existence. Pennsylvania R. Co. v. Chamberlain, 288 U. S. 333, 53 S. Ct. 391, 77 L. Ed. 819; Winn v. Consolidated Coach Corporation (C. C. A.) 65 F. (2d) 256; Frazier v. Georgia Railroad & Banking Co., 108 Ga. 807, 33 S. E. 996; Penn Mutual Life Ins. Co. v. Blount, 39 Ga. App. 429, 147 S. E. 768; Neill v. Hill, 32 Ga. App. 382, 123 S. E. 30. On the issue of negligence as made by the pleadings, the motion for a directed verdict ought to have been granted.

Exception is taken to the charge of the court as follows: "Evidence has been introduced by the plaintiff in this case tending to show that the offending loom was wholly in the control and care of the defendant, that no one else had meddled with it and that the occurrence was such as ordinarily would not happen without negligence on the part of the owner or custodian of the instrument and that such accident could not have happened if such loom had been in good repair. These are circumstances which you may consider along with all the other evidence in the case and if you find by a preponderance of the evidence that the manner of the occurrence and the circumstances are of such character that would in your judgment authorize an inference that the occurrence could not have taken place if due diligence had been exercised by the defendant, you would be authorized to make such an inference though you are not required to do so by law." The case pleaded was not one of res ipsa loquitur, such as is described in the first part of the quoted charge, in which the plaintiff may, because he does not know just what negligence caused his injury, put the burden of explanation on the defendant. Blanton v. Great Atlantic & Pacific Tea Co. (C. C. A.) 61 F. (2d) 427. The pleader here assumed to know and alleged the defects in the loom. Though the existence of those particular defects could of course be established by circumstantial evidence, the case cannot be opened to inferences of other defects than those alleged by application of the principle of res ipsa loquitur. King v. Davis, 54 App. D. C. 239, 296 F. 986, 987–989. See Atlanta Coca-Cola Bottling Co. v. Danneman, 25 Ga. App. 43, 102 S. E. 542; Bonita Theatre v. Bridges, 31 Ga. App. 798, 122 S. E. 255. Though in its ending the quot-

ed charge does not say so, it is calculated to give the jury the impression that, if they thought the occurrence could not have taken place if due diligence had been exercised by the defendant, they might find for the plaintiff, irrespective of whether the negligence so inferred was that alleged in the amended petition. If on other allegations or other evidence the case should again go to the jury, so ambiguous an instruction would best be omitted.

The judgment is reversed and the case remanded for further proceedings not inconsistent with this opinion.

HUTCHESON, Circuit Judge (dissenting).

This is another of those interesting cases in which the law abounds, where judges, presumably possessing highly trained and thoughtful minds, trained in abstract reasoning, versed in the principles and the problems of proof, knowing in a scientific way how to evaluate evidence, to relate fact with fact, and how to draw correct inferences from them, find themselves irreconcilably differing upon the question whether there is evidence for plaintiff's side of a case on which reasonable minds could base a verdict.

Finding myself in accord with the District Judge that there was evidence to take the case to the jury, and with the jury that the verdict they found is not unreasonable, I make bold to set down, with supporting references to the record, what plaintiff's proof amounted to and to point out the source of what I believe to be the error of the majority. This is the record as plaintiff's proof makes it out.

Appellee, a minor, while working with the knowledge and consent, and as an invitee of, appellant, assisting her father, a weaver, had her eye put out by a shuttle, which, escaping from the loom, flew out and struck her with great violence. She did not know, nor was she warned, that, if the shuttle box came out of alignment or anything went wrong with the precise adjustment its successful operation required, the shuttle might fly out. Plaintiff proved by her father that the loom had gotten out of fix that morning; that he had called this to the attention of the loom fixer, whose duty it was to keep the looms in repair; that, after it had been repaired, he had started it up and run it for the balance of the day; that just before the accident the thread broke, and the loom had automatically stopped, as it should have done; that he went and pulled the thread back through the eye of the shut-

tle and put it back in the machine. "There is no reason I know of that would cause a shuttle to fly out if you start it properly and it was in good operating condition." (Rec. p. 34.) "I started the loom up properly. I have been operating a loom for years, and at the time that shuttle flew out and struck my daughter I was operating it properly. There was no carelessness whatever on my part." (Rec. 35.)

He further testified that there are lots of bolts in the loom that hold it rigid and steady; that there is more or less vibration in operation, causing screws to come loose; that it was the duty of the loom fixer to constantly notice and keep the loom in proper shape. Plaintiff's other witnesses Haile (Rec. 47) and Salter (Rec. 50) said the same thing,[1] "That if it was in proper shape it is not possible for a result to happen as happened to my daughter." (Rec. 58.) "If these parts of the loom that you have there (speaking of a loom offered in evidence) are in proper shape, it is not possible for this thing to fly out into the aisle." (Rec. 37.)

Defendant's testimony fully corroborated that of plaintiff, that the shuttle could not possibly have come out as it did if it was properly operated, unless the box was out of alignment or there was something wrong with the operating mechanism of the loom. Every witness testified that the operations of the loom were attended with a great deal of vibration; that in time screws would work loose, the box would tend to become worn more on one side, the picker would tend to become worn, and, generally, that it was necessary to have constant supervision and repair going on. One of their witnesses, Lyle, a weaver, testified:

"Shuttle boxes have got not to be loose. I am talking about the four of them since this is perfectly straight and rigid, this has got to shoot right straight into the other box. As to whether the slightest deviation would cause that thing to miss, well, some of them are worse than others. It is not my duty to see whether the screws are tight or not. The loom fixer is supposed to watch them. They

[1] This is the witness who said, "There are a hundred different things or more which would cause a shuttle to come out and fly into the aisle," but that this was not meant to be taken literally is shown by the statement following: "As to what would be the main cause of that, screws can come loose and nuts can come loose and get out of line, out of order, the nuts come loose, let it drop, to give one case. At to what is the reason for the nuts coming loose, you constantly have to look after them to keep them tight, due to the vibration of the machine. If they are kept tightened up and in order the shuttle won't hardly ever come out. I have never seen one fly out." (Rec. 50 and 51.)

will work all right for a few hours and then all of a sudden it would swerve and throw things out. It is the loom fixer's duty to keep them fixed; to go around and see about it." (Rec. 65.)

He testified that, if the box was not out of order, it would be possible to throw the shuttle out by improper operation either in starting it or in stopping it; that they will fly out if they are in perfect alignment or in perfect shape if you pick a loom too quickly. "They aren't right then, or they will not do like that. It is either out of order or something is wrong with the picking arrangement for it to fall out." (Rec. 66).

Defendant's two main witnesses, Caston, the overseer, and Benton, the loom fixer, swore positively that there was no faulty alignment, nothing wrong with the box at all, or with any part of its mechanism; that after the accident they found nothing wrong. They swore that the only thing which could have caused the shuttle to come out must have been Smallwood's faulty operation of the loom. Caston made his testimony very strong in this regard, testifying that he had made a most thorough examination of the loom, and that he found nothing in or connected with it which would cause it to throw out the shuttle. (Rec. 77, 81–82 and 83.) His testimony in fact so completely eliminated every possible defect or trouble in the mechanism as a cause of the shuttle flying out as that it drove him to take a position directly contradicting Smallwood's testimony that he operated the machine properly, putting him, not, as the majority stated, in a position of a witness whose testimony is uncontradicted and unimpeached, but of a witness whose testimony, if Smallwood is to be believed, is patently untrue. On page 89 Caston said:

"It could come out without that box being out of alignment. He could have failed to push the shuttle against the picker and that threw it out. As to whether it would be possible for a shuttle to fly out in the way this one did without something being out of order, the only thing that was wrong he didn't start it up right"; and examined by the court (Rec. 93) he testified: "As to my opinion on what caused this shuttle to fly out, I think it was the way the loom was started up. That was faulty operation."

In addition to this contradiction, Caston was flatly contradicted by both the father and the daughter on the issue of the daughter being in the mill with his consent. Finally, as he was bound to do to sustain his testimony that there was nothing wrong with the loom,

he gave it as his positive opinion that faulty operation caused the shuttle to fly out. (Rec. 89–93.)

The loom fixer, Benton, testified in direct contradiction to the testimony of Caston that, if the box was not in a satisfactory condition of alignment, the shuttle would not do anything but come out, and, in corroboration of Lyle, that it would run for a while and then suddenly pop out, if there was something wrong: "Having gotten a signal from the weaver at 8:30 in the morning that the loom was out of fix, he started it up and it ran a little while and then it slammed and banged off. It ran across a few times and once it hit the protection that was on it and stopped right there. After it stopped I started it another time to see if it would do the same thing and it ran a little while and did the same way, and I knew that something was wrong with it." (Rec. 103.)

And then he fixed it, and this is the way he testified he fixed it: "I went down to the other end of the loom and I put the shuttle against the rod in the upper box that time and I saw the shuttle would run a little and I knew it wasn't true, and I got a straight edge and I taken the straight edge and ran it on my lay until it came to the end of that box and when it got there and wouldn't touch it, it didn't touch it at all until it got away back in the box. I loosened the set screw at the back of the box back to which it is fastened and got some little thin pieces of cardboard and I put pieces in until I got that box back to where it would come out flush with my straight edge, and after I got that there slid clean across I knew that it was all right. I followed the standard way of adjusting that part of the loom. It is the only way I have ever learned." (Rec. 102, 103.)

As to the examination he made at Caston's direction after the injury, he testified to seeing Caston starting the loom and running it for a while, and that after that he commenced looking around to see if he could find anything loose; that the only thing he found loose was the bolt which holds one end of the stand which holds the protection rod; that that bolt, however, had nothing to do with propelling the shuttle or guiding the shuttle, and that it did not affect the operation of the shuttle because there were two other bolts in that part which were tight, and anyway, if that rod had been clean off, it would not have affected the shuttle.

He testified further (page 109) that, before the flag indicating trouble was raised, he did not have pasteboard in the loom; that

the pasteboard was necessary because he wanted to get it lined up, and that was the only means he had to get it in line. "It had been lined before, and it was off, and that was what I was doing when I went to it. I do not know whether the pasteboard had dropped out; I did not see the pasteboard."

While he did not say so, directly, his testimony was to the same effect as that of Caston, that, as there was nothing wrong with the machine, the only possible cause of the shuttle coming out must have been faulty operation.

It is stated in the majority opinion that three of defendant's employees, the loom fixer, the overseer, and another weaver testified that, after the injury, the shuttle was replaced, the loom carefully examined, nothing found wrong with it.

The majority is, I think, mistaken in stating that the weaver testified to the examination of the loom. This weaver, Gaddy, did testify that he went over to the loom, picked up the shuttle and laid it on the front of the loom: "I stayed there at my work. The next thing that was done to that loom Mr. Caston and Mr. Benton was the next ones I seen at the loom. They started the loom up and it ran some ten or fifteen minutes. They stopped it. Mr. Benton looked over the loom. He started to examine it."

He further testified: "As to what could throw the shuttle in that position the loom could have been started wrong. As to the way you can start the loom to get that result, you can fail to push the shuttle up in the box to start it."

Instead, then, of this being a case, as the majority states it, of testimony "candid, clear and reasonable, and unopposed by other witnesses or by circumstances which are irreconcilable with it," this is a case in which defendant relies on the testimony of two of its employees, one, the overseer, the other, the loom fixer, both greatly interested in exonerating both themselves and the company from blame, directly and positively contradicted by, and contradicting the testimony of, Smallwood, the weaver, that the injury was the result, not of fault in the mechanism, but of fault in the operation of it. Besides, the testimony of Caston that the machine could not run for a while right and then go wrong, but must either run right all the time or wrong all the time, is contradicted by the positive testimony of Benton and Lyle, and by the whole record; while the testimony of Benton as to the way he fixed the machinery and as to what he found makes a fact issue for the jury whether he did not fix it so that it came

out of alignment sufficiently to throw the shuttle out at the time it struck the girl, but not sufficiently to throw it out all the time.

I have no quarrel with the authorities the majority cite. They recognize that contradictions, inconsistencies, and incredibilities prevent the operation of the rule invoked. I think the case on this point is ruled by our case, Mutual Life Ins. Co. v. Sargent, 51 F. (2d) 4, 6, and the authorities cited in it, and that, speaking generally, this case is one in which, under the application of the res ipsa doctrine, it was for the jury to say whether the testimony of Smallwood that the machine was operated properly, and therefore it must have been out of order, or that of Caston and Benton that the machine was in order, and therefore must have been operated improperly, is true. This was to be determined by the ordinary rules of weighing evidence and the credibility of witnesses. This was for the jury.

But the majority say that the state of the pleadings is such as that plaintiff may not avail herself of the res ipsa rule.

The doctrine of res ipsa loquitur is a rule of reasoning on evidence. It is not a rule of pleading. Texas-La. Power Co. v. Daniels (Tex. Civ. App.) 61 S.W.(2d) 179, 184; Bonita Theatre v. Bridges, 31 Ga. App. 798, 122 S. E. 255; Chenall v. Palmer Brick Co., 117 Ga. 106, 43 S. E. 443; Atlanta Coca-Cola Bottling Co. v. Danneman, 25 Ga. App. 44, 102 S. E. 542. It is the rule in most jurisdictions that, unless the plaintiff has by definite allegations of negligence, as it did in Augusta R. & Electric Co. v. Weekly, 124 Ga. 384, 52 S. E. 444, tied itself to a particular ground, or cause of fault, it may, under general allegations of fault, avail itself of the doctrine. The rule of pleading in Georgia is even more liberal. There it is held that, where evidence is admitted without objection, which supports what is in fact the same cause of action, although it might have been excluded on objection, it may be availed of as a basis for recovery, if, under the facts of the case, the petition could by amendment have been so conformed to the proof as to render such testimony relevant. Atlantic Life Ins. Co. v. Jackson, 34 Ga. App. 555, 130 S. E. 378; Napier v. Strong, 19 Ga. App. 401, 91 S. E. 579.

While, if there was any deficiency in plaintiff's pleading, it has been cured by the reception of the evidence without objection, plaintiff does not need to invoke this rule. In the fullest kind of way her pleadings put in issue the defective character of the loom so as to permit her to recover if the evidence

sustains the position she took, that the thing spoke negligence. Though in her original petition she did specifically charge that the picker sticks were warped, crooked, and out of line, and would not perform their functions, in the eighteenth paragraph she made out a typical case for the application of the doctrine. There she alleged that the loom was out of condition, that the defendant had negligently permitted it to be operated in that condition so that it would not throw the picker stick to picker stick as intended by the manufacturer, and that, had it been in proper condition, the shuttle would have been thrown from picker stick to picker stick between the warps and would not have struck plaintiff in the eye; that her injury was therefore due to the improper condition of the loom, and the improper condition was the result of plaintiff's negligence. When she first amended by striking out the word "stick" after "picker," she amended to more fully allege, not only a defect in the picker and stick, but that the shuttle boxes in which the pickers operate were out of alignment, and were loose, especially the one on the left-hand side of the loom, the vibration of the machinery had caused the box to become out of line, and that this condition was negligence.

Finally, by trial amendment of March 9, when she learned how the loom fixer had undertaken to repair the loom, she amended to allege:

"Plaintiff amends by leave of the Court as follows:

"Paragraph 19 by adding thereto: The defendant was actively negligent to plaintiff in that it knowingly improperly repaired the loom at which she was hurt in this, the 4 box shuttle box was out of alignment, and a few hours prior to the injury it, through its loom fixer, Benton, improperly and negligently repaired same by placing wads of pasteboard between the place where it is screwed on to the machine (both being iron) in such a way it knew or by the exercise of ordinary care should have known that it would not long support it in position; knowing that the loom vibrated and would throw it out, or mash it and thereby throw shuttle box out of alignment so that shuttle expelled would be thrown into loom aisle where operator of loom worked and where petitioner was and not thrown in to shuttle box on other side as intended or would do if in proper fix.

"B. In using a box side that was not trued, and would not fit snug and rigid as one properly trued and fitted.

"C. In knowing these facts and not warning petitioner of the dangerous condition of said loom."

Under these allegations, it was competent for the plaintiff to put in any fact which tended to establish that the boxes were out of alignment, and that because of that the shuttle flew out. When the evidence is considered in the light of the unquestioned physical fact that either there was something wrong with that machinery, or with Smallwood's operation of it, I think it makes the clearest kind of a case for the jury's verdict, as to which was the case.

I therefore respectfully dissent.