25754. WALKER *v.* PERRY, administrator.

DECIDED NOVEMBER 17, 1936.

R. S. *Foy,* for plaintiff in error.

MacINTYRE, J. "Leon Perry, as administrator de bonis non of the estate of I. A. Bush Sr., deceased," alleges in his declaration in attachment that Mrs. Ela S. Walker is indebted to him as such administrator $3769.44, with interest, said indebtedness being evidenced by nine promissory notes, copies of which are attached to the declaration as exhibits A to I, inclusive. The first eight of these notes, aggregating $1500, are dated and payable at different times during the year 1920, and are signed by both the defendant and her husband, J. R. Walker, where makers usually sign, the defendant's name being immediately above that of her husband. The last of said notes, a copy of which is attached to the declaration as exhibit I, is for the principal sum of $2269.44, dated February 22, 1921, payable November 1, 1921, and signed by Mrs. Ela S. Walker alone. All of said notes are payable to I. A. Bush, and all are in the usual form. After admitting a prima facie case in her answer, the defendant pleads that she was married to J. R. Walker when said notes were signed; that the first eight notes (exhibits A to H, inclusive) "represent debts and obligations of her said husband, J. R. Walker, and not any debt or obligation of" the defendant; and that the large note for $2269.44 (exhibit I) "was given to . . I. A. Bush Sr., by this defendant, for the purpose of extinguishing and satisfying all of said notes . . from exhibit A to H., inclusive, together with another note representing an obligation of her said husband, in the amount of . . $500, together with interest on all said last-mentioned notes, and was given without any other consideration whatever; all of which last-mentioned notes represent debts and obligations of her said husband, and not any debt or obligation of" the defendant. The

jury found "in favor of the plaintiff for $1500, with 8 per cent. interest from date of notes attached," and the defendant excepted to the overruling of her motion for new trial on general and special grounds.

Having assumed the burden of proof, Mrs. Walker testified, in part, that she had been the wife of J. R. Walker since 1900; that from 1917 to 1921, inclusive, she "was not engaged in any business of any kind, either direct or in any manner;" that she "owned some property during that time, which was operated by Mr. Walker [her husband], who was operating it for himself;" that she "was engaged in no farming . . or other business of any kind;" that I. A. Bush was her "uncle by marriage, and stepfather;" that her husband owned the "Lamar place," but she thought he sold it in 1917; and that she thought her husband owned no property in 1920. She further testified: "I did not sign them [the eight smaller notes] voluntarily. Mr. Walker asked me to sign them. I made no arrangements with Judge Bush to get the money, and did not want Mr. Walker to get any money on my credit to operate the farm with. The first I knew of any arrangements between Mr. Walker and Judge Bush was when Mr. Walker told me he had made arrangements, when they were already made. I never got any of the money and never talked to Judge Bush about it. I didn't sign any of the notes at Judge Bush's house, but in my own house at Arlington. Mr. Walker brought them to me. The large note for . . $2269—I received no part of it, and Mr. Walker borrowed none on my account. I signed the note at Mr. Walker's solicitation, and there was no consideration for these notes except to secure the debt of my husband."

J. R. Walker testified, in part, as follows: "In 1917, I went to Judge Bush and asked him for the loan of $500. I offered him certain securities, and he said he could not use it. I told him Mr. Covington and Mr. Bostwick would use it. . . So he said get them to indorse for me, and he would let me have it. I went to them, and they accepted the security, and I got $500 on that indorsement. My wife had no connection with the deal at all. I did not pay the amount back to Judge Bush. In 1920 I had another transaction with Judge Bush. I went to him in the spring and asked him if he could make me a loan of $1500. He said he could, and I told him I would like to get it in small amounts, for

the reason that I wanted to avoid paying as much interest as I could help. . . So I called on him as I needed it, and gave small notes for it. My wife had nothing to do with my borrowing this money. I made my own arrangements about it. He loaned to me individually, and told me to get her to indorse with me or sign with me, which I did. . . I . . . got $1500 along through the year 1920. Subsequently I made notes for it. He gave the money to me. None of the money passed to Mrs. Walker, none that I know of. I never heard of any passing to her. At that time I was operating her farm. She and I had no understanding. I was just operating it just as it were mine, just exactly. I bought the guano on my own account, and paid for it in the same way. I employed the labor, furnished the stock, and she had nothing to do with it except to let me have the farm. I took care of the taxes, though there was no understanding between us about it. I just operated it as my own, . . in my own name and on my own account. I gave the notes as the advances were made. The notes appear to have been executed in Arlington. As the notes were given, I would sign them and give them to her to sign. I could not say just where; that has been fifteen years ago. . . All of them are in my handwriting. She signed at my suggestion, and the notes appear over my signature and hers. A note dated February 22, 1921, for $2269.44, represents the $500 I got from Judge Bush [in 1917], and the notes for $1500 and interest on them, . . until the time of this note [for $2269.44]. It was given to extinguish those other indebtednesses. It is signed by Mrs. Walker. . . I asked her to. He asked for a mortgage on her place, and I told her so. That was after all the money had been advanced, the next year. The money was advanced in 1920, and this note signed in 1921. The money had already been received by me and spent by me. When this became due I was unable to pay it, and he asked me to embody all the amounts, the $500 and the $1500, in one note and let my wife give him a mortgage on her home in Arlington for the full sum, which was done. This last note is in my handwriting too. When I borrowed the $500 in 1917, I gave Judge Covington and Mr. Bostwick a mortgage on a place I had over there. It was a warranty deed to secure them. When I arranged with Judge Bush to embrace all these amounts in the one note, Mr. Covington and Mr. Bostwick

·reconveyed this land to me. . . . I never borrowed any money except the $2000 from Judge Bush, which, with interest, is embraced in the note for $2269.44. . . My wife signed the note at my request, to secure my indebtedness to Judge Bush and to pay off my indebtedness to Judge Bush."

On cross-examination, J. R. Walker testified; in part: "I do not know where all these notes were signed. . . That was fifteen years ago, and I don't remember where I was when I signed them. I would not say whether I got any money from Judge Bush before I signed the note. . . I got the money and gave notes for it. I wouldn't swear whether any of it was paid in Arlington, though I think it was all paid to me there. . . I wouldn't say whether she [Mrs. Walker] went with me when I got the $1500. I don't know. He may have been in Arlington when it was arranged. Referring to the signing of the little notes, it is a hard matter to remember all about the places of signing each of those notes. It is not true that Mrs. Walker got the money. . . I don't suppose that any one suggested Mrs. Walker's signing the notes first. I suggested that she sign them, but do not know that I suggested where to sign. .I would write the note out, sign it, and give it to her to sign. Judge Bush asked me, when I first made arrangements to get the money, to get her to sign it, and I did. . . I don't remember as he ever told me he would let her have it. . . I do not know whether Judge Bush gave me the money in cash or check. . . It was his custom to give checks, so far as I know. I would judge he gave me a check. I don't know what bank he gave me check on, or whether I would cash it on the bank on which it was given or take it back to Arlington. . . In 1920 I did not own any property. Mrs. Walker owned a piece of property in Arlington and a piece down about three or four miles this side of Arlington—seventy acres in Arlington, on which she owed about $3000, and about the same amount on that in the country, possibly $2000. . . I got $500 from Judge Bush, and executed a note for it payable to Covington and Bostwick. I don't know just how I got the money, whether in money or check. Mr. Bostwick did not give me the money. Mr. Covington may have; or Judge Bush may have. . . I can only say Judge Bush told me if I would get Mr. Covington and Mr. Bostwick to indorse the note, he would let them have the money,

or me. I got the money. . . I did not get that note back, and do not know where it is. I have never paid the money back. It was put in the $2200 note at Judge Bush's instance. It made Judge Bush mad when I drew the draft. He wasn't very much in love with me, for he didn't approve the draft. He did warm up to me, though, when he saw I was not trying to pull anything. We were on very friendly terms. I think he really felt like I was trying to be a clean-cut ·fellow at last. But at first he was irritated with me for drawing the draft, a little bit sore about it."

The plaintiff introduced in evidence the nine notes declared on, together with a warranty deed dated March 17, 1917, in which J. R. Walker was grantor and W. A. Covington and J. C. Bostwick grantees, reciting a consideration of $500; and a quitclaim deed dated April 5, 1921, in which Covington and Bostwick were grantors and J. R. Walker was grantee.

The fact that the notes declared on were signed by the wife, apparently as principal, raises the presumption that she actually signed as principal; but this presumption was rebuttable. *Jones v. Weichselbaum*, 115 *Ga.* 369, 370 (41 S. E. 615). The burden was on the defendant to sustain her plea by a preponderance of the evidence (*Harden v. Harden*, 26 *Ga. App.* 192, 105 S. E. 869), and that burden she assumed and undertook to carry. "A defense established by the positive and uncontradicted testimony of unimpeached witnesses can not lawfully be arbitrarily disregarded." *W. & A. R. Co.* v. *Beason*, 112 *Ga.* 553 (37 S. E. 863). But evidence is not *arbitrarily* disregarded when it is "contradicted or discredited by other evidence or circumstances." *Brunswick & Western R. Co.* v. *Wiggins*, 113 *Ga.* 842 (39 S. E. 551, 61 L. R. A. 513); *Central Ry. Co.* v. *Mote*, 131 *Ga.* 166 (62 S. E. 164). The following from *Landrum* v. *Leachman*, 32 *Ga. App.* 471 (123 S. E. 915), appears to be an application of this rule: "Where a note is executed by a married woman and her husband apparently as joint makers, the consideration for which is the payee's sale of certain personalty,—as a farm tractor, the use of which inures to the benefit of the wife, as where the tractor is utilized by the husband in cultivating a farm belonging to the wife from which she receives support,—the inference is authorized that the wife, in executing the note ostensibly as a maker, was such in reality, and that the obligation was an original undertaking by her, and

not one of suretyship. This is true though the husband alone negotiated the sale with the payee, and the wife was not present and took no part in the negotiations, but signed the note afterwards at the instigation of the husband." To be valid, the defense had to be established by a preponderance of the evidence; and in determining where the preponderance of evidence lies, the jury may consider, among other things, "all the facts and circumstances of the case, the witnesses' manner of testifying, . . the probability or improbability of their testimony," and their "interest or want of interest." Code, § 38-107. It is the general rule that transactions between husband and wife to the prejudice of creditors should be closely scanned. *Booher* v. *Worrill,* 57 *Ga.* 235, 238. Let us view the instant case in the light of the foregoing rules of law. The payee in the notes declared on was dead, and the defendant and her husband were still married at the time of the trial. Not only were all of the smaller notes, on which the verdict seems to have been based, signed by the defendant and her husband apparently as principals, but the wife's name appears to be signed as the first principal—above that of her husband; and the husband, who testified that he filled out and signed the notes and then had his wife to sign them, swore that he did not know that he "suggested where to sign," and that the note signed by the wife alone was given to satisfy the eight smaller notes aggregating $1500, another note for $500 given in 1917, and interest. Yet the latter note was that of the husband, and the wife was not interested in it or connected with it in any way. The husband's testimony in regard to the signing of the notes and how and when he got the money is rather vague and uncertain. The farm, to run which the $1500 evidenced by the eight smaller notes was borrowed, belonged to the wife, but the husband paid the taxes thereon. The payee in the notes consistently refused to lend money to J. R. Walker on his credit alone. Indeed, Walker had not paid the $500 borrowed by him in 1917, when the notes aggregating $1500 were executed in 1920. The suit was for $3769.44 and interest, while the verdict was for $1500 and interest. We are of the opinion that the evidence presented by the defendant was not *arbitrarily* disregarded, and decline to reverse the judgment on the general grounds.

In the four special grounds of the motion for new trial the fol-

lowing excerpt from the court's charge is separated and criticised: "The question you are to settle is whether it was borrowed for the husband, Mr. Walker, and for him alone. If it was, she would not be liable. If it was borrowed for both of them, for their joint benefit, she would be liable. If it was borrowed for her to carry on the business for herself, she would be liable. Now, gentlemen, those are the issues which you are to try in this case, and you are to look to all the evidence in the case to determine those issues. If this was the debt of her husband, Mrs. Walker would not be bound for it. It could not be enforced upon her. If it was the joint debt of both of them or her debt alone, why, she would be liable for it." The first two sentences of this charge are assigned as error, because "it limits the non-liability of the defendant to the use to which such money might be put, rather than on whose credit and by whom the money was actually borrowed." Error is assigned on the sentence that "if it was borrowed for both of them, for their joint benefit, she would be liable," because (1) it "provides that she would be liable in event she received benefit along with her husband for such money borrowed, whether upon his or her credit," and (2) "there is no evidence in the record on which to base such charge." On the sentence, "If it was borrowed for her to carry on the business for herself, she would be liable," error is assigned because (1) "there is no evidence on which to base such instruction, the entire evidence showing affirmatively that the defendant carried on no business for herself," and (2) the charge expressed the court's opinion that "there was sufficient evidence in the record to support a verdict finding the fact to be true that the defendant did carry on a business for herself." At the very bottom of the assignments of error is the contention that the court erred because the charge was not supported by the evidence. If our finding that the verdict was supported by the evidence is correct, this basic criticism is without foundation. Neither do we think that there is merit in the other main criticism, that the charge limited "the non-liability of the defendant to the use to which such money might be put, rather than on whose credit and by whom the money was actually borrowed." It will be observed that in concluding the charge the court carefully grounded the right of the plaintiff to recover on the question as to whether the debt was that of Mrs. Walker or that of her husband. We will

544

state here that we purposely omitted reference to the fourth and last special ground, for the reason that it sets out the excerpt first quoted and is largely a repetition of the grounds more specifically stated. In conclusion, we will state that the charge given in the instant case is closely patterned after the charge given in *Harden* v. *Harden,* supra, and approved by this court. The fairness of the charge is illustrated by the following instructions, which immediately precede the excerpt first quoted herein: "I charge you that . . it doesn't matter what form a transaction takes. Any instrument executed by a married woman as a surety for any person, or as an assumption of her husband's debts, is not binding on her. . . I charge you also . . that the mere fact that a married woman permits the use of her property by her husband would not bind her if he was carrying on the business for himself. I charge you . . also that it would make no difference which party actually received the money; that is, in whose hands the money was delivered." At the very conclusion of charge the court instructed the jury as follows: "The fact that the husband cultivates his wife's land does not raise the presumption of law or fact that he is her agent. The position of her name on the paper is no presumption against her; but you take all the facts and circumstances of the case, of the entire transaction as it is developed at the trial, and arrive at the truth of the transaction." The charge appears to have been entirely fair to the plaintiff in error, and we hold that none of the assignments of error upon it is meritorious.

*Judgment affirmed. Broyles, C. J., and Guerry, J., concur.*